# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard E. Griffith and Noreen  :
F. Griffith, husband and wife  :
 :
    v.  :   No. 1062 C.D. 2018
 :   ARGUED: May 6, 2019
Millcreek Township,  :
     Appellant  :

BEFORE:   MARY HANNAH LEAVITT, President Judge
      HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION BY**
**SENIOR JUDGE LEADBETTER**      **FILED: July 30, 2019**


   Millcreek Township appeals from an order of the Court of Common Pleas of Erie County (trial court) overruling the Township's preliminary objections and granting the petition for appointment of a board of viewers. The petition, filed by Richard E. Griffith and Noreen F. Griffith, husband and wife (Landowners), alleged a *de facto* taking of property[1] when a 2013 storm water landslide rendered their home uninhabitable. In this appeal, we must consider the difference between such a taking and a simple tort claim in order to determine whether the damages to the Griffith property (the Property) were the immediate, necessary, and unavoidable consequence of the Township's exercise of its eminent domain power. For the reasons that follow, we reverse.

---

[1] The property is located at 5020 Saybrook Place in Section 3 of the Garnesdiyo Subdivision in the Township.

The pertinent background of the subdivision is as follows: In March 1966, the original owners of the entire parcel of land encompassing the Subdivision (Developers) applied to the Township for approval of the plot plan for Section 1 of the Subdivision. (Trial Court's Op. at 1-2.) In the ensuing decades, they developed and constructed six sections. In a September 1987 letter, the Township engineer congratulated Developers on completion of the subdivision and informed them that the Township supervisors had officially released the remaining bonds. (Stipulated Fact "S.F." Nos. 95-96.) Accordingly, with the Township's September 1987 accepted dedication of the storm water pipes, the Township assumed ownership and responsibility for maintaining the subdivision's entire storm water system. (Trial Court's Op. at 16.)

With respect to the Property itself, in 1979 Developers conveyed the original Lot 13, subsequently known as 5020 Saybrook Place, to the Venables. In 1992, Mr. Griffith, one of the current Landowners, purchased the Property from the Venables. In 2006, Mr. Griffith conveyed the Property to Landowners in a quitclaim deed. In 2012, the owners of adjoining Lot 12, the Mrazes, divided it into Lots 12 and 12A. Following the conveyance of Lot 12A, Landowners executed a consolidation deed merging Lots 12A and 13 into a single parcel. (*Id*. at 3.) That irregularly shaped parcel encompasses 4.09 acres, overlooks Lake Erie, and features a single-family home near the southeastern corner of the lot. (S.F. No. 3.) The "Property is bounded on the north by a crest of a bluff above Lake Erie, on the south by a public street named Saybrook Place, on the west by a residential lot, and on the east by a residential lot and ravine. . . ." (S.F. No. 4.) The corner of the house closest to the ravine is twenty feet west of it. (*Id*.) In addition, "[n]umerous large, heavy,

2

and tall trees with trunks as much as forty inches in diameter existed along the entire length of [the] Property's eastern boundary along the [r]avine." (*Id*.)

As for the September 2013 event that precipitated Landowners' petition, a massive landslide of trees and soil fell along the entire eastern boundary of the Property forcing Landowners to abandon their home. (Trial Court's Op. at 3.) In describing the landslide, the trial court stated:

> The subsidence was so severe it removed the soil supporting the concrete footers for the eastern half of the Griffiths' residence. This loss in fundamental support impacted the entire structural integrity of [the] home, rendering it uninhabitable. An open fault line was created on the level area of [Landowners'] property presenting an ominous and dangerous condition.

(*Id*.)

As for the subdivision's storm water system, the pertinent mechanics are as follows: Two large pipes discharging storm water into the ravine aim directly at the west bank of the ravine at the point where the eastern part of the Property collapsed. (*Id*. at 23.) The thirty-six inch pipe, which draws storm water from Sections 1 and 2 of the subdivision and runs through drainage Easement No. 1, is situated one or two feet above the bottom of the ravine. The forty-two inch pipe, which draws storm water from the remaining sections and diverts it through Easement No. 2 to Easement No. 1, is situated about four feet above the bottom of the ravine and directly above the smaller pipe. (*Id*.) "Both pipes have an open flow of water descending from these elevated positions directly onto the ground." (*Id*.) Notably, there is no anti-erosion landscaping or outlet protection such as headwalls, wing walls, or riprap rock at the end of the two pipes to dissipate the energy of the water cascading directly onto the hard clay bottom of the ravine. (*Id*. at 23-24.)

Also with regard to the storm water system, the trial court observed that the Township in 1979 permitted the elimination of a planned Easement No. 3 and a discharge point for storm water into a sedimentation basin. (*Id*. at 13-14.) In contemplating the elimination, the trial court observed that the only storm water being discharged into the ravine when the building permit was issued to the Venables, the original owners, came from Section 1.[2] (*Id*. at 14.) With the Township's 1979 acceptance of plans without Easement No. 3, "[a]ll of the storm water that was intended to be discharged within Easement No. 3 instead got diverted into larger pipes that ultimately got discharged through the [forty-two]-inch pipe in Easement 1." (*Id*.) The trial court characterized the elimination as having "a direct impact on the reasons why the . . . landslide occurred . . . ." (*Id*.) Accordingly, the trial court concluded that "[t]he overwhelming weight of the engineering evidence is that the Township's storm water system . . . was the primary cause of accelerated erosion of the west ravine bank along the eastern border of [Landowners'] property." (*Id*. at 24.)

In August 2015, Landowners filed their petition alleging that the Township's design, construction, review, acceptance, operation and/or maintenance of the subdivision's storm water system caused a landslide on the property, rendered their home uninhabitable, and constituted a *de facto* taking under Section 502 of the Eminent Domain Code, 26 Pa.C.S. § 502.[3] In September 2015, the Township filed preliminary objections asserting that there was no taking, that Landowners improperly asserted a trespass claim, and that the petition was untimely. In March

[2] The 1977 building permit provided: "Owner assumes total responsibility for locating dwelling in close proximity to top of ravine." (Trial Court's Op. at 13.)

[3] Landowners also filed a five-count complaint in the lower court alleging, *inter alia*, trespass, private nuisance, public nuisance, and negligence. (August 15, 2015, Complaint, Docket No. 12376-15; Appendix to Township's Brief at 44-54.)

4

2018, the parties entered into a comprehensive stipulation of facts. Subsequently, the trial court conducted an April 2018 hearing at which only Mr. Griffith and his expert testified. In July 2018, the trial court overruled the preliminary objections and granted the Petition. The Township's appeal followed.[4]

Pursuant to 26 Pa.C.S. § 502(c)(1), the owner of a property interest may file a petition for the appointment of viewers seeking compensation for an alleged injury to property by asserting "that the owner's property has been condemned without the filing of a declaration of taking." There is a heavy burden of proof in *de facto* taking cases. *Rowland v. Dep't of Gen. Servs.*, 820 A.2d 896, 899 (Pa. Cmwlth. 2003). Specifically, the owner must allege and prove the following: 1) condemnor has the power to condemn the land under eminent domain procedures; 2) exceptional circumstances have substantially deprived the owner of the use and enjoyment of the property; and 3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the power of eminent domain. *Appeal of Jacobs*, 423 A.2d 442, 443 (Pa. Cmwlth. 1980). The power of eminent domain has been characterized as "the power to take property for public use" without the consent of the property owner. *Hill v. City of Bethlehem*, 909 A.2d 439, 444 (Pa. Cmwlth. 2006). We have noted that, "a *de facto* taking must result from a governmental body's actual exercise of the power of eminent domain." *Rowland*, 820 A.2d at 898.

However, to the extent that the "actual exercise of the power of eminent domain" suggests actions identical to a *de jure* condemnation but without the filing

---

[4] In this appeal, we are asked to consider whether the trial court erred as a matter of law, a question over which we exercise plenary review. *Pacella v. Washington Cty. Tax Claim Bureau*, 10 A.3d 422, 425 n.4 (Pa. Cmwlth. 2010).

of a declaration, such as the acquisition of property by consent,[5] our cases make clear that is too restrictive a view. Rather, "[a] *'de facto* taking' occurs when an entity clothed with the power of eminent domain has, by even a non-appropriative act or activity, substantially deprive[d] an owner of the beneficial use and enjoyment of his property." *Genter v. Blair Cty. Convention & Sports Facilities Auth.*, 805 A.2d 51, 55 (Pa. Cmwlth. 2002). Further, "a *de facto* taking requires that the injury complained of [be] a direct result of *intentional action* by an entity incidental to its exercise of its eminent domain power." *DeLuca v. Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 562 (Pa. Cmwlth. 2017) (emphasis added); *see also Williams v. Borough of Blakely*, 25 A.3d 458, 463 (Pa. Cmwlth. 2011). On the other hand, where injuries result from the *negligence* of a condemning body's agents, there is no *de facto* taking. *Jacobs*, 423 A.2d at 443; *see also Williams*, 25 A.3d at 467 n.6 (tort claims such as trespass do not support a claim for a *de facto* taking). In this regard, it must be noted that many, if not most, negligence cases involve some intentional conduct by the tortfeasor. The critical question is whether the actor knew—or willfully closed his eyes to that which he should have known—that his action would cause the harm, or whether that harm was merely foreseeable.

Two cases illustrate the distinction between governmental action which constitutes negligence and that which amounts to a *de facto* taking: *Jacobs* and *DeLuca*. In *Jacobs*, the owners experienced serious drainage problems attributable to a change in natural topography caused by the upstream erection of a high school, a retirement home, and several single residential homes. They alleged a *de facto* taking, maintaining that the township unlawfully issued the building permits,

---

[5] Interestingly, the 1987 acceptance of the dedication of the storm water system could be so characterized, although that act was remote in time from Landowners' injury, and in no way could the landslide be said to be the *immediate and necessary* consequence of that acquisition.

6

improperly approved the subdivision, and wrongfully contributed to the design of the drainage plans for the high school. We disagreed, concluding that the township's issuance of the building permits, approval of the subdivision, and contribution to the design of the drainage plans "were in no manner related or incidental to the [t]ownship's condemnation powers." *Jacobs*, 423 A.2d at 443. Additionally, observing that the owners were charging the township with negligence in performing the aforementioned actions, we concluded that no recovery could be obtained through eminent domain proceedings. Further, we stated that courts were more likely to find a taking where the government's action complained of was purposeful and deliberate, such as the drainage plans at issue in *Greger v. Canton Township*, 399 A.2d 138 (Pa. Cmwlth. 1979).[6]

In *DeLuca*, we considered whether the sanitary authority's repeated infiltration of sewage onto the owner's property effected a *de facto* condemnation. In determining that the discharge amounted to a *de facto* taking, we focused on the authority's intentional action. Specifically, we cited the authority's choice to operate its system in a manner that would sporadically result in reoccurring sewage infiltration events. In affirming the lower court's order granting the owner's petition for appointment of a board of viewers, we noted the authority's failure to take appropriate steps to remedy the structural defects in its system *despite its knowledge that the system as designed and built continued to cause the reoccurring events*.

---

[6] In *Greger*, the lower court concluded that the flooding of the owners' property was the direct and necessary consequence of the township's drainage plans and, therefore, constituted a *de facto* taking. This Court, however, did not discuss the distinction between negligence and willful conduct and it is impossible to determine whether the trial court's use of the term "necessary" meant that the township knew that flooding would result from its actions. Therefore, we do not find the holding in *Greger* applicable here.

7

In the case at hand, the trial court focused on the cumulative nature of the Township's actions or failure to act with respect to the storm water system over the course of decades. In general, the trial court noted the Township's incremental approvals, power to impose conditions, imposition of conditions, failure to impose conditions such as additional discharge points and easements, acceptance of the dedicated storm water system, and subsequent maintenance. More specifically, the trial court determined that, from 1966 to 1987, "[t]he Township had the authority to review, place conditions on, demand changes to, [and] refuse the approval and/or ownership of the storm water system within the Subdivision." (Trial Court's Op. at 9.) In addition, "[s]ince [1987], the Township has owned and had the responsibility to maintain all of the storm water system for the entire Subdivision knowing that it discharges into the ravine in Easement 1 adjacent to [Landowners'] property." (*Id*. at 16.) In that regard, the trial court emphasized "the Township's proactive role in the diversion of storm water that dramatically changed the normal flow and manner of storm water coming into the ravine in Easement 1." (*Id*. at 17.) In so doing, the trial court dismissed the notion that the Township's actions over time were ministerial, instead characterizing the Township's planning and approval from 1966 to 1987 as intentional and active. The trial court did not however find, or even suggest, that the Township knew or turned a blind eye to a likelihood that its acts would cause a landslide, let alone one that would destroy Landowners' home.

We must conclude that the trial court's rationale, based on the parties' stipulated facts and the evidence adduced at the hearing, relates to a trespass claim rather than a *de facto* taking. While the Township might have been negligent in the planning and operation of the storm water system, a question which is not before us

8

and which we do not decide, it did not effect a *de facto* taking pursuant to the Eminent Domain Code.[7]

Accordingly, we reverse.[8]

 

 

-----------------------------------

**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

---

[7] Actions in trespass and claims for condemnation are not mutually exclusive. *DeLuca*, 166 A.3d at 561. In other words, "[a] judgment in trespass does not bar a subsequent condemnation claim." *Id*.

[8] In light of our determination that Landowners failed to establish a *de facto* taking, we need not address the applicability of the statute of limitations or any issues regarding the effect of Landowners' purchase of the Property with presumed knowledge of the easements.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard E. Griffith and Noreen  :
F. Griffith, husband and wife  :
                                :
               v.  :   No. 1062 C.D. 2018
                                 :
Millcreek Township,  :
                  Appellant  :

# O R D E R

AND NOW, this 30th day of July, 2019, the order of the Court of Common Pleas of Erie County is hereby REVERSED.

_____ _____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge