IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Mountaintop Area Joint      :
Sanitary Authority      :
     :
Colleen DeLuca      :
     :
         v.      :     No. 1318 C.D. 2016
     :     Argued: April 20, 2017
Mountaintop Area Joint Sanitary      :
Authority,      :
         Appellant      :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE JOSEPH M. COSGROVE, Judge (P)
              HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT            FILED: July 12, 2017

Mountaintop Area Joint Sanitary Authority (Authority) appeals an order of the Court of Common Pleas of Luzerne County (trial court) overruling its preliminary objections to the petition of Colleen DeLuca (Landowner) for the appointment of a board of viewers.[1] Landowner asserted that the Authority's discharge of sewage onto her property effected a *de facto* condemnation. For the reasons that follow, we affirm the order of the trial court.

Landowner owns a single-family home in Mountaintop, Pennsylvania, which is located adjacent to the Authority's sewer treatment plant. The Authority's collection system runs under Landowner's property, and two of its manholes are located on the surface of Landowner's property. On several occasions between June 27, 2006, and April 26, 2011, Landowner's home and

---

[1] The trial court granted Landowner's petition for appointment of a board of view and held that the condemned interest of Landowner's property was an easement with effective dates of June 27, 2006, through April 26, 2011.

lawn were flooded with sewage, which included fecal matter, toilet tissue, and other sanitary items.

On May 14, 2015, Landowner filed a petition for appointment of a board of viewers pursuant to Section 502(c) of the Eminent Domain Code[2] alleging that the repeated infiltration of sewage on her property constituted a *de facto* taking. Specifically, she alleged the Authority knew that its sewage system was prone to overloads that would cause infiltration of sewage onto her property. Despite this knowledge, the Authority allowed additional properties to connect to its system, thereby increasing the number of such overloads.

In response, the Authority filed preliminary objections pursuant to Section 504(d) of the Eminent Domain Code. It objected to the legal sufficiency of the petition noting that it merely repeated the facts pled in Landowner's pending

---

[2] Section 502(c) provides:

    (c)    Condemnation where no declaration of taking has been filed. –

        (1)    An owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) setting forth the factual basis of the petition.

        (2)    The court shall determine whether a condemnation has occurred, and, if the court determines that a condemnation has occurred, the court shall determine the condemnation date and the extent and nature of any property interest condemned.

        (3)    The court shall enter an order specifying any property interest which has been condemned and the date of the condemnation.

        (4)    A copy of the order and any modification shall be filed by the condemnor in the office of the recorder of deeds of the county in which the property is located and shall be indexed in the deed indices showing the condemnee as grantor and the condemnor as grantee.

26 Pa. C.S. §502(c).

trespass action.[3]  Alternatively, it challenged the facts alleged in the petition and requested an evidentiary hearing pursuant to Section 504(d) of the Eminent Domain Code.  26 Pa. C.S. §504(d).[4]

On December 23, 2015, following oral argument, the trial court denied the Authority's preliminary objection in the nature of a demurrer but granted its request for an evidentiary hearing.  That hearing was held on April 4, 2016.

Thomas Keiper, the Executive Director of the Authority, testified. Keiper acknowledged that the Authority's customer base had increased every year from 2007 through 2011; by 2011 the Authority served approximately 5,000

---

[3] The earlier civil trespass action is captioned *Colleen DeLuca v. Mountaintop Area Joint Sanitary Authority and Thomas G. Keiper*, and docketed at 2011 CV 14420 in the trial court. The complaint is included in the record.  Reproduced Record at 147a-157a (R.R. ___).

[4] It states:

> (d)  Preliminary objections. –
>
> (1) Any objection to the appointment of viewers may be raised by preliminary objections filed within 30 days after receipt of notice of the appointment of viewers.
>
> (2)  *Objections to the form of the petition* or the appointment or the qualifications of the viewers in any proceeding *or to the legal sufficiency or factual basis of a petition* filed under 502(c) (relating to petition for appointment of viewers) are waived unless included in preliminary objections.
>
> (3) An answer with or without new matter may be filed within 20 days of service of preliminary objections, and a reply to new matter may be filed within 20 days of service of the answer.
>
> (4) The court shall determine promptly all preliminary objections and make any order and decrees as justice requires.
>
> (5)  *If an issue of fact is raised, the court shall conduct an evidentiary hearing or order that evidence be taken by deposition or otherwise, but in no event shall evidence be taken by the viewers on this issue.*

26 Pa. C.S. §504(d) (emphasis added).

3

customers. During that time, the average amount of sewage being transported through the Authority's system was 4.16 million gallons per day, which was the maximum permitted by the Pennsylvania Department of Environmental Protection. Nevertheless, the Authority's plant has the capability to handle more than 10 million gallons per day.

Keiper also testified about the two manholes on Landowner's property, *i.e.*, Manhole 3 and Manhole 128. He explained that a manhole is a vertical channel that provides access to the underground sewage main. Three sewage pipes connect to Manhole 128: two sewer lines and one lateral pipe connected to Landowner's home. The wastewater leaves Manhole 128 by one sewer line and travels downstream to Manhole 3, which also accepts sewage waste from two other sewer lines. The lines that carry sewage into Manhole 3 measure 30 inches, 18 inches and 8 inches in diameter. The wastewater that enters Manhole 3 leaves by way of one 30-inch line. In short, in the case of both Manhole 128 and Manhole 3, sewage enters by multiple sewer lines but exits by a single 30-inch line.

The slope of the sewer lines flowing toward Manhole 128 and Manhole 3 is steeper than the slope of the single exit pipes leaving those manholes. Accordingly, sewage enters each manhole at a faster rate than it can exit. Nevertheless, the Authority did not measure the flow of the sewage at Manhole 3 and Manhole 128 and did not install high flow alarms. Keiper testified as follows:

> [Counsel]: So the pipes that flow into Manhole 3, carry more flow as a capacity, the design capacity carry more flows than the single pipe carrying anything out right?
>
> [Keiper]: *That would be the design capacity, yes.*

4

[Counsel]: The Authority, you agree with me, does not have in place any type of device that meters the flows going in and out of Manhole 3, correct?

[Keiper]: That's correct.

[Counsel]: And it also has no meters to measure the flows going in and out of Manhole 128?

[Keiper]: That's correct.

[Counsel]: And would you agree with me that the Authority has high flow alarms at other locations in the system?

[Keiper]: It has them at pump stations and it has them at the plant. It does not have them anywhere else in the system.

[Counsel]: But you do have the capacity to measure high flows in certain parts of your system, correct?

[Keiper]: Yes.

[Counsel]: But you don't have any such facilities in Manhole 3 or Manhole 128, correct?

[Keiper]: Correct.

Notes of Testimony at 27-28 (N.T. ___); R.R. 105a-106a (emphasis added).

Keiper explained that a surcharge occurs when the wastewater reaches the top of the sewage line and surges into the vertical manhole. An overflow event occurs when the wastewater fills the barrel of the manhole and comes out of the system completely.[5] He testified that Manhole 3 has experienced overflow events, causing sewage waste to overflow onto Landowner's property.

---

[5] Specifically, Keiper explained:

> [Counsel]: For both Manhole 128 and Manhole 3, for there to be an overflow event, the volume of wastewater has to be enough that its gotten outside the channel, it started to fill up the barrel of the pipe, it's covered the top of the pipe []

**(Footnote continued on the next page . . .)**

5

Keiper testified that a duckbill valve attached to the lateral pipe between Landowner's home and Manhole 128 prevented backflow to Landowner's residence, and it apparently worked until the 2006 incident. Then, in 2006, a surcharge caused sewage to back up through the lateral pipe and enter Landowner's residence. When questioned about the 2006 flooding, Keiper acknowledged that a surcharge in Manhole 128 bypassed the backflow valve and traveled in the reverse direction through the lateral pipe into Landowner's toilet and bathtub. In response, Keiper sent an engineer to investigate.

> [Counsel]: And when [Landowner] made her complaint to the [A]uthority initially about the problem she had in her home, did you ask [the Engineer] to explore what the problem was?
>
> [Keiper]: Yes, I did.
>
> [Counsel]: And what exactly did he tell you?
>
> [Keiper]: He went out and he opened the manhole, Manhole 128, and checked the duckbill valve and found that there was debris in the valve and that's what, in his opinion, what caused the backflow because the valve was kept open with the debris and it didn't close.

N.T. 66; R.R. 115a.

Four years later, in November 2010, sewage again entered Landowner's home. Similar events occurred in January 2011, March 2011, and April 2011. In response, Keiper directed the Authority's engineers to look for

---

**(continued . . .)**
taking flow out, it's kept on going up and to get out of Manhole 3 and 128, it has to be at least ten feet tall because that's how high it is to the top?

[Keiper]: Yes.

N.T. 31; R.R. 106a.

6

alternative valves to prevent the flooding to Landowner's property. The Authority's engineer recommended that the Authority install a check valve in the sewage line on Landowner's property to prevent another backflow incident.[6] Although the Authority had installed check valves in other parts of its system, it did not act upon the engineer's recommendation with respect to the lines on Landowner's property.

In late 2011, the Authority upgraded its collection system, and there have been no overflow events since the upgrade. Keiper testified that the Authority has replaced the duckbill valve at Manhole 128 twice since the upgrade.

Landowner testified. She described her home as a "basic three bedroom, two-bath ranch." N.T. 74; R.R. 117a. Three bedrooms, a kitchen, and a living area are located on the ground level, which is accessible from the street. The finished lower level of the home includes a "two-car garage[,] … a sewing room, a living room and a full bathroom with a washer and dryer." N.T. 75; R.R. 117a.

Landowner testified that the first incident occurred on June 27, 2006, when "fecal matter and toilet tissue" began seeping out of the toilet and bathtub located in the lower level of the home. N.T. 77; R.R 118a. The seepage continued for several hours resulting in knee-deep levels of sewage throughout the lower level. When Landowner contacted the Authority, it informed her that the incident was a "fluke" and that it was "not a sewer issue but rather … a fresh water run-off

___

[6] A check valve is described as a device that allows water to travel in one direction only. If water starts to come in from the opposite direction, the valve "pivots" closed and the pressure of the water keeps the valve shut. N.T. 71; R.R. 116a.

problem."[7]  N.T. 79; R.R. 118a.  She was advised to install sump pumps, which she did.  Thereafter, Landowner remodeled the lower level of the home.

Four years later, in November 2010, Landowner experienced the "[s]ame thing that happened in 2006."  N.T. 81; R.R. 119a.  The sewage was knee-deep and consisted of debris, toilet paper, prophylactics, blood, and tampons.  Landowner testified that she "completely lost everything again."  N.T. 82; R.R. 119a.

Landowner explained that the recurring flooding has precluded normal use of the home:

> I was in house arrest.  I couldn't use the toilets, the shower, the laundry.  I couldn't make food.  I had to find somewhere to live with my kids when [the Authority] chose to come over on several occasions.

N.T. 84; R.R. 120a.  She explained that the Authority came to her home on several occasions and plugged her sewer lines with "balls" in order to prevent further flooding, causing her to be displaced from her home:

> [Counsel]:  Now, did there come to be a point where the Authority proposed that it would try and solve your problem by using what they called balls?
>
> [Landowner]:  No, they just showed up.
>
> [Counsel]:  They just showed up. Okay. In that instance, can you tell me what happened?
>
> [Landowner]:  Yeah.  I had come home from work and [Authority employee] was walking down my driveway with balls in his hand.  And he told me that he was sent over by [Keiper] because we were supposed to get potential rain and that he was going to plug my lines, and I didn't know what that

---

[7] Landowner's property is located within feet of a flood plain.  N.T. 63; R.R. 114a.

8

meant. And he explained to me that I needed to find some place to go for the weekend until Monday or Tuesday when the water tables would drop because I couldn't use my home.

* * *

[Counsel]: What did [Authority's employee] tell you why you couldn't stay at your house?

[Landowner]: He told me that the insertion of the balls was to prevent any future back up at that point or the potential for a lot of rain coming that particular weekend. That's all I knew.

[Trial Court]: And when was this?

[Counsel]: When was this?

[Landowner]: This was in 2011, January. And once again in March. And I asked him to leave when he was going to do it a third time because I had nowhere to go.

N.T. 87-90; R.R. 120a-121a.

Following the hearing, the trial court issued an order on June 29, 2016, which stated:

1)   A *de facto* condemnation occurred;

2)   The condemned interest of [Landowner] was an easement with effective dates of June 27, 2006 through April 26, 2011; and

3)   [Landowner's] Petition for an Appointment of View [is] GRANTED.

Trial Court Order, 6/29/2016; R.R. 139a. The Authority appealed to this Court.

On appeal,[8] the Authority argues the trial court erred in holding that a *de facto* condemnation resulted from an involuntary easement on Landowner's

---

[8] Our review of a trial court's order dismissing preliminary objections to a petition for the appointment of viewers is to determine whether the trial court abused its discretion or committed **(Footnote continued on the next page . . .)**

land for the period June 27, 2006, through April 26, 2011. Landowner's sole remedy lies with her trespass action that is pending before the trial court. In the alternative, the Authority posits that the trial court incorrectly calculated the effective period of the taking because (1) the June 27, 2006, overflow incident, used to establish the beginning of the easement period, is time-barred by statute, and (2) Landowner continued to reside on the property throughout the entirety of the easement period.

Landowner responds that this Court lacks jurisdiction because the Authority did not file post-trial motions as required by the Pennsylvania Rules of Civil Procedure. She also contends that her trespass action does not preclude a separate action for condemnation.

We begin with Landowner's jurisdictional argument. Pennsylvania Rule of Civil Procedure 227.1 states, in relevant part, as follows:

> (c) Post-trial motions shall be filed within ten days after
>
> > (1) verdict, discharge of the jury because of inability to agree, or nonsuit in the case of a jury trial; or
> >
> > (2) notice of nonsuit or the filing of the decision in the case of a trial without jury.

PA. R.C.P. No. 227.1(c). The Authority did not file post-trial motions upon receipt of the trial court's order.

---

**(continued . . .)**
an error of law. *Maurizi v. Department of Transportation*, 658 A.2d 485, 486 n.2 (Pa. Cmwlth. 1995). The trial court, as fact finder, must resolve evidentiary conflicts, and its findings will not be disturbed if supported by substantial evidence. *In re Condemnation by Department of Transportation*, 827 A.2d 544, 547 n.4 (Pa. Cmwlth. 2003), *appeal denied*, 848 A.2d 930 (Pa. 2004).

The Authority filed preliminary objections to Landowner's petition for the appointment of a board of viewers.[9]  Count I presented a demurrer pursuant to Section 504(d)(2) of the Eminent Domain Code,  26 Pa. C.S. §504(d)(2).  Count II requested an evidentiary hearing pursuant to Section 504(d)(5) of the Eminent Domain Code because it disputed the facts alleged in Landowner's petition.  26 Pa. C.S. §504(d)(5).  The trial court denied the Authority's demurrer but granted the Authority's request for an evidentiary hearing under Section 504(d)(5) of the Eminent Domain Code, which states:

> If an issue of fact is raised, the court shall conduct an evidentiary hearing or order that evidence be taken by deposition or otherwise, but in no event shall evidence be taken by the viewers on this issue.

26 Pa. C.S. §504(d)(5).[10]

Based upon the facts established at the hearing, the trial court held that a *de facto* taking had occurred.  Accordingly, it directed the appointment of a

---

[9] In eminent domain cases, "[p]reliminary objections are the exclusive method under the Code of raising legal and factual objections to a petition for appointment of viewers that alleges a *de facto* taking…."  *Linde Enterprises, Inc. v. Lackawanna River Basin Sewer Authority*, 911 A.2d 658, 662 (Pa. Cmwlth. 2006).

[10] This court has explained:

> [I]f the preliminary objections raise an issue of fact, the resolution of which is necessary for determining whether a *de facto* taking has occurred, the court must hold an evidentiary hearing.  If the preliminary objections do not raise any such issues of fact, the trial court must simply examine the petition and sustain the preliminary objections if the averments of the petition are not sufficient to establish a *de facto* taking, or dismiss the preliminary objections if the averments do establish a *de facto* taking.

*Millcreek Township v. N.E.A. Cross Company*, 620 A.2d 558, 560-61 (Pa. Cmwlth. 1993).

11

board of viewers. We reject Landowner's contention that this Court lacks jurisdiction over the Authority's appeal.

First, post-trial motions need not be filed where preliminary objections are overruled in an eminent domain case. Under the Pennsylvania Rules of Civil Procedure, post-trial motions are to be filed *after* a board of viewers does its work. Rule 227.1(h) states:

> A motion for post-trial relief shall be filed following a trial upon an appeal *from the decision of viewers* pursuant to the Eminent Domain Code.

PA. R.C.P. No. 227.1(h) (emphasis added).

Second, the Pennsylvania Rules of Appellate Procedure expressly authorize an appeal as of right of court order that denies preliminary objections in an eminent domain case. Rule 311(e) states:

> (e) Orders overruling preliminary objections in eminent domain cases. – An appeal may be taken as of right from an order overruling preliminary objections to a declaration of taking and *an order overruling preliminary objections to a petition for appointment of a board of viewers.*

PA. R.A.P. 311(e) (emphasis added).

The Authority did not have to file post-trial motions upon receipt of the trial court's decision to overrule its preliminary objections. Post-trial motions would have been premature. Instead, the Authority appealed, and its appeal was expressly authorized by Pennsylvania Rule of Appellate Procedure 311(e). We reject Landowner's jurisdictional argument and turn, then, to the merits of the Authority's appeal.

The Authority first argues that Landowner's sole remedy is to pursue trespass damages. The Law distinguishes between the two remedies.

12

The Pennsylvania Constitution provides that private property cannot be taken for a public use without just compensation. Pa. CONST. art. I, §10. "[A] *de facto* taking occurs when an entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property." *In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P. ex rel. Lehigh-Northampton Airport Authority*, 903 A.2d 1192, 1199 (Pa. 2006). A property owner carries a heavy burden of proof in *de facto* condemnation proceedings and must show that: (1) the condemnor has the power to condemn the land under eminent domain procedures; (2) that exceptional circumstances have substantially deprived him of the use and enjoyment of his property; and (3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the eminent domain power. *Genter v. Blair County Convention and Sports Facilities Authority*, 805 A.2d 51, 56 (Pa. Cmwlth. 2002). Finally, when determining whether a *de facto* taking has occurred, we focus on the governmental action in question. *Appeal of Jacobs*, 423 A.2d 442, 443 (Pa. Cmwlth. 1980).

On the other hand, acts that are not the immediate, necessary or unavoidable consequence of the exercise of eminent domain will not form the basis of *de facto* condemnation. *Fulmer v. White Oak Borough*, 606 A.2d 589, 590 (Pa. Cmwlth. 1992). "Generally, where a landowner suffers specific damage to his property as a result of the negligent acts of a party with the power of eminent domain, the proper action lies in trespass." *Poole v. Township of District*, 843 A.2d 422, 424 (Pa. Cmwlth. 2004). Nevertheless, the two species of action are not mutually exclusive. A judgment in trespass does not bar a subsequent

condemnation claim. *Matter of Condemnation by Urban Redevelopment Authority of Pittsburgh*, 458 A.2d 622, 623 (Pa. Cmwlth. 1983).

The Authority argues that it did not effect a *de facto* taking because Landowner's damages did not result from the immediate, necessary, and unavoidable consequences of an eminent domain action. In support, it cites this Court's decision in *In re: Condemnation by the Youngwood Borough Authority*, (Pa. Cmwlth., No. 203 C.D. 2014, filed December 5, 2014), where we held that the landowner's only recourse was an action in trespass and not a *de facto* condemnation action under the Eminent Domain Code.

*Youngwood* concerned a railroad museum and café owned and operated by the Youngwood Borough Railroad Association. Beginning in 2007 and escalating in 2009, the local sewer authority's main sewer line overloaded and contaminated the Railroad Association's basement with "feces, toilet paper, effluent and blackened water having a strong odor." *Id.*, slip op. at 2. The Railroad Association filed a petition for the appointment of viewers alleging a *de facto* taking. The sewer authority responded with preliminary objections arguing that the petition did not state a claim for a *de facto* taking because the Railroad Association had a full, complete, and adequate remedy at law in a separate trespass action already pending before the trial court.

After an evidentiary hearing, the trial court sustained the preliminary objections. The trial court held that the Railroad Association's sole remedy was in trespass because the sewer authority's acts were negligent, not intentional.

This Court affirmed, noting that the sewer authority had made good faith efforts to correct the problem. We acknowledged that a *de facto* condemnation does not require an intention to acquire a property but only that the

14

injury "is a *direct result of intentional action* by an entity clothed with the power of eminent domain." *Id.*, slip op. at 8, n.2 (quoting *McGaffic v. City of New Castle*, 74 A.3d 306, 315 (Pa. Cmwlth. 2013), *appeal denied*, 85 A.3d 485 (Pa. 2014)) (emphasis in original). In *Youngwood*, the losses suffered by the plaintiff were "merely the unintended consequence" of the sewer authority's inability to separate storm water from the sanitary sewer system despite their efforts, and was "not part of a purposeful and deliberate drainage plan nor related to or incidental to [the Authority's] condemnation powers…." *Id.*, slip op. at 7.

The Authority argues the facts in this case are nearly identical to those in *Youngwood*. Therefore, this case warrants the same conclusion: Landowner's sole remedy lies in trespass.

Landowner responds that it was the intentional *operation* of the Authority's collection system that led to the foreseeable and repeated flooding of her property. She asserts the sewage overflow was the direct and immediate consequence of Authority decisions made with the knowledge that flooding would reoccur on her property. Specifically, Landowner maintains that the Authority: (1) designed and built a system to direct a volume of wastewater into two manholes on Landowner's property that exceeded the capacity of those manholes; (2) failed to monitor the level of wastewater in its manholes despite having installed monitoring systems at other points in the system; (3) continued to allow more properties to connect to the system, which increased the volume of wastewater passing through the manholes on Landowner's property; (4) failed to fix leaks or take steps to prevent rain or groundwater from entering the system; and (5) used Landowner's residence as the "pressure relief valve" in its system for the conditions that were causing the repeated surcharges. By doing so the Authority avoided having to

15

expend funds to remedy its design flaw. Landowner's Brief at 22-24. Landowner urges that the Authority's deliberate actions support the trial court's finding of a *de facto* taking. That the Authority did not intend to effect a taking is irrelevant.

As noted, a *de facto* taking requires that the injury complained of is a direct result of intentional action by an entity incidental to its exercise of its eminent domain power. *McGaffic*, 74 A.3d at 315. Here, the trial court agreed with Landowner that the reoccurring sewage infiltration events resulted from the *manner* in which the Authority chose to operate its system. The trial court specifically noted that the infiltration events ended when the Authority upgraded its system in late 2011. Ultimately, the trial court concluded:

> The evidence was overwhelming as to the conditions that [Landowner] endured after these occurrences. Raw sewage flowed out of the toilets and tubs throughout the residence into the lower level of the house and the garage. The sewage consisted of various items including fecal matter and toilet tissue. The sewage was not contained to the bathroom areas but through the [Landowner's] living area and laundry area. As [Landowner] testified, the entire lower level was destroyed. Based on the facts outlined above [Landowner] has shown that the [Authority's] action has deprived her of her availability to fully use her residence, that a[] de facto condemnation occurred, that the [Landowner's] interest condemned was an easement, and the effective dates of the condemnation is from June 27, 2006 through April 26, 2011.

Trial Court Opinion, 6/29/2016, at 5; R.R. 145a. We agree.

The trial court's finding that the Authority *chose to operate* its system in a manner that would sporadically flood the interior and exterior of Landowner's property is well supported by the evidence. Specific decisions of the Authority caused the overflow events and the Authority was aware of the adverse consequences of those decisions.

First, the Authority decided to expand its customer base from 2007 through 2011 and increase the volume of sewage flowing through its system. Second, the Authority designed Manhole 3 and Manhole 128 to have sewage enter from multiple steep-sloped sewer lines but exit through a single, narrower, and less-sloped exit line. It requires no extended discussion that these decisions alone affected the amount of sewage flowing through its system and increased the likelihood of overflow events occurring on Landowner's property. Third, the Authority was aware of this likelihood. This is evidenced by Authority employees "showing up" at Landowner's property, on several occasions, and requiring her to vacate her home so the Authority could plug her sewer lines with "balls" to prevent flooding. N.T. 87-90; R.R. 120a-121a.

Despite this knowledge, the Authority did not take appropriate steps to remedy the structural defects in its system. Instead, it pursued *ad hoc* remedies that required Landowner to vacate her home. Stated otherwise, it is clear that the flooding and loss of the use and enjoyment of Landowner's home were the "direct result of intentional action [taken] by" the Authority incident to its power of eminent domain. *McGaffic*, 74 A.3d at 315.

This case is distinguishable from *Youngwood*. In that case, there was no finding that the landowner's harm derived from a "purposeful and deliberate drainage plan" as was the case here. *Youngwood*, slip op. at 7. Here, the trial court specifically found that the infiltration onto Landowner's property resulted from the *manner* in which the Authority operated its system. This Court will not disturb a trial court's dismissal of preliminary objections to a petition for the appointment of a board of viewers unless the trial court abused its discretion or committed an error

17

of law. *Maurizi*, 658 A.2d at 486 n.2. The Authority has failed to make its case in this regard.

We next address the Authority's argument that the trial court erred in holding that "[t]he condemned interest of Plaintiff was an easement with effective dates of June 27, 2006 through April 26, 2011." Trial Court Order, 6/29/2016; R.R. 139a. The Authority argues: (1) using the June 2006 occurrence to determine the easement period is time-barred by statute, and (2) the evidence did not establish a five-year easement but only five discrete occurrences of sewage infiltration, which did not require Landowner to abandon her home. Landowner responds that the Authority waived the statute of limitations defense by failing to raise it in its preliminary objections. She also observes that a taking can occur even where a property owner remains in her home.

We begin with the statute of limitations issue. Section 5527(a)(2) of the Judicial Code states:

> If the condemnor has not filed a declaration of taking, a petition for the appointment of viewers for the assessment of damages under 26 Pa. C.S. must be filed within six years from the date on which the asserted taking, injury or destruction of the property occurred or could reasonably have been discovered by the condemnee.

42 Pa. C.S. §5527(a)(2). The first flooding occurred on June 27, 2006. Landowner filed the petition for appointment of viewers nearly nine years later, on May 14, 2015. Had the Section 5527(a)(2) defense been preserved, the June 2006 incident would be time-barred by statute. However, we agree with Landowner that the Authority waived the statute of limitations by not raising it in its preliminary objections.

18

Preliminary objections in eminent domain proceedings should not be confused with the rules of pleading governed by the Pennsylvania Rules of Civil Procedure. "Preliminary objections are the exclusive method under the Eminent Domain Code of raising legal and factual objections to a petition for an appointment of viewers which allege a *de facto* taking." *In re Petition for Appointment of Board of Viewers*, 149 A.3d 911, 913 n.1 (Pa. Cmwlth. 2016) (quoting *German v. City of Philadelphia*, 683 A.2d 323, 325 n.5 (Pa. Cmwlth. 1996)). Section 504 of the Eminent Domain Code specifically states:

> Objections in the form of the petition or the appointment or the qualifications of the viewers in any proceeding or the legal sufficiency of the factual basis of a petition filed under section 502(c) (relating to petition for appointment of viewers) are waived unless included in preliminary objections.

26 Pa. C.S. §504(d)(2). The Authority did not raise the statute of limitations defense in its preliminary objections to Landowner's petition for appointment of a board of viewers. It was raised for the first time in the Authority's Reply Brief in Opposition to Landowner's Petition for the Appointment of a Board of Viewers, filed April 13, 2016. Although the reply brief was filed prior to the issuance of the trial court's June 29, 2016, opinion, it is well-settled that raising an issue in a brief will not cure previous waiver of that issue. *See Moore v. City of Philadelphia*, 571 A.2d 518, 524 n.8 (Pa. Cmwlth. 1990). Accordingly, the Authority's statute of limitations defense has been waived.

We turn, then, to the Authority's challenge to the easement period of five years. The evidence proved five discrete occurrences of sewage infiltration. The Authority argues that these incidents did not create an easement period that

began with the first flooding and ended with the last. It argues that the easement period should be limited to the specific dates of sewage infiltration.

Precedent from this Court has established that an easement period can be based on sporadic occurrences of flooding. Indeed, condemnors regularly institute *de jure* condemnations for the occasional overflow, flood, or submersion of a condemnee's property. *See Bucks County v. 800 Acres of Land in Middletown Township*, 379 A.2d 903, 904 (Pa. Cmwlth. 1977); *Pennsylvania Game Commission v. Renick*, 342 A.2d 824 (Pa. Cmwlth. 1975); *Commonwealth v. Herold*, 330 A.2d 890 (Pa. Cmwlth. 1975). It follows, then, that the obverse is also true. Where it is the landowner that has instituted a condemnation proceeding, occasional flooding incidents can be used to establish the period of easement.

The trial court held the easement period spanned from June 27, 2006, the date of the first overflow incident, to April 26, 2011, the date of the last. We agree that this was the extent of the taking, and the fact that the overflow incidents occurred only occasionally is inconsequential. Nevertheless, the sporadic nature of the overflow events is a consideration for the board of viewers in its determination of the amount of just compensation owed to Landowner.

For the reasons stated above, we affirm the order of the trial court.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Mountaintop Area Joint   :
Sanitary Authority   :
  :
Colleen DeLuca   :
  :
      v.   :   No. 1318 C.D. 2016
  :
Mountaintop Area Joint Sanitary   :
Authority,   :
          Appellant   :

## **O R D E R**

AND NOW, this 12th day of July, 2017, the order of the Court of Common Pleas of Luzerne County dated June 29, 2016, in the above-captioned matter is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge