IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In the Matter of: Condemnation by     :
the Franklin Township Sewage     :
Authority of Property of William Ott,     :
Situate in the Municipality of     :    No. 1237 C.D. 2019
Murrysville, Westmoreland County,     :
Pennsylvania     :    Submitted: May 15, 2020
    :
Appeal of: William Ott     :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge


OPINION BY
JUDGE McCULLOUGH                                FILED: June 8, 2020


      William Ott (Landowner) appeals from the July 24, 2019 order of the Court of Common Pleas of Westmoreland County (trial court) sustaining the Franklin Township Municipal Sanitary Authority's (Authority) preliminary objections to Landowner's petition for the appointment of a board of viewers (Petition), which alleged that the Authority's actions constituted a *de facto* taking of Landowner's property located in Murrysville, Westmoreland County, Pennsylvania (Property).


**Facts and Procedural History**

      On October 14, 2017, Landowner initiated an action pursuant to the Eminent Domain Code[1] by filing the Petition, alleging that flooding on the Property from overflowing sewage lines in November 2003, August 2007, and October 2012 resulted from a *de facto* taking by the Authority. The Authority filed preliminary

---

[1] 26 Pa.C.S. §§101-1106.

objections to the Petition, arguing that Landowner filed the Petition after the statute of limitations expired and that Landowner's proper avenue of redress was through a trespass action because a *de facto* taking did not occur. On October 9, 2018, the trial court entered an order overruling the Authority's preliminary objection relating to the statute of limitations, but determined that an evidentiary hearing was necessary to decide whether the alleged injury constituted a *de facto* taking. Thereafter, the trial court conducted a hearing on January 31, 2019.

At the hearing, the Authority's manager, Kevin Kaplan, testified that the Authority's sewage collection system was installed from 1968 to 1969 using terra cotta/clay pipes. (Notes of Testimony (N.T.) at 13, Reproduced Record (R.R.) at 4.) Mr. Kaplan stated that although terra cotta pipes were common in the 1960s, over the course of time, terra cotta pipes can crack and break and their joints can separate and dislodge. (N.T. at 14, R.R. at 4.) Mr. Kaplan testified that Landowner had experienced sewage backups on the Property. (N.T. at 15, R.R. at 4.) He explained that the Authority had conducted an investigation of the backups, which included using CCTV to visually inspect the sewer. *Id.* Mr. Kaplan stated that because of the backup issues experienced by Landowner, the Authority installed a check valve in 2008 to try to resolve the problem. (N.T. at 15-16, 48, 19, R.R. at 4-5, 12.) After the first check valve failed, the Authority installed a second check valve in 2012, and Mr. Kaplan was unaware of any flooding of the Property after the installation of the second check valve. (N.T. at 20, 48, R.R. at 5, 12.)

Mr. Kaplan testified that the Authority had experienced problems with its collection system for a number of years due to the "inflow and infiltration of rainwater and groundwater" into the system. (N.T. at 25, R.R. at 7.) Mr. Kaplan explained that inflow occurs when landowners directly and illegally connect downspouts, French drains, and driveway drains into the sewage system. *Id.* Mr. Kaplan stated that these direct connections to the sewage system can overwhelm the system because it results

2

in an excess amount of water entering the system during rain events, which can "cause surcharging or backups due to the amount of flow." (N.T. at 26, R.R. at 7.) Mr. Kaplan further stated that infiltration occurs when rainwater or groundwater seeps into broken or cracked pipes or separated joints. *Id.* He testified that the effect of infiltration is similar to that of inflow. Mr. Kaplan also testified that manholes were previously constructed using brick and that overtime the mortar in brick manholes can break down and cause infiltration. (N.T. at 28, R.R. at 7.)

Mr. Kaplan observed that although the typical flow into the sewage system is 3.5 million gallons per day, during an extreme weather event the system can experience up to 19 million gallons per day because of inflow and infiltration. (N.T. at 30, R.R. at 8.) In an attempt to rectify the problems related to inflow and infiltration, the Authority started a lateral inspection program of the sewage system that uses CCTV video. (N.T. at 32, R.R. at 8.) When the Authority identifies an inflow or infiltration issue during its inspection program, it decides what kind of corrective action needs to be taken. (N.T. at 33, R.R. at 8.) In instances where the Authority identifies an unapproved inflow into its sewage system, it typically sends the landowners a letter instructing them that the inflow needs to be removed or corrected and, if that is ineffective, files a legal action against the landowners in the magisterial district court. (N.T. at 40, R.R. at 10.) The Authority typically conducts inspections once or twice a week. (N.T. at 34, R.R. at 8.) The Authority started the lateral inspection program in 2011 and, since then, has inspected 1,800 homes and repaired inflow and infiltration issues at 470 homes. (N.T. at 44, R.R. at 11.) The Authority had other inspection programs in place before the lateral inspection program started. (N.T. at 45, R.R. at 12.) Mr. Kaplan testified that the backups and overflows that Landowner had experienced on his Property had been caused by inflow and infiltration surcharging. (N.T. at 46, R.R. at 12.)

Mr. Kaplan stated that the Authority does not intend to permit infiltration and inflow into the sewage system because it is detrimental to the system. (N.T. at 47, R.R. at 12.) He stated that, ideally, the Authority would replace all of its terra cotta pipes, but that the Authority has 245 miles of terra cotta lines and he estimates it would cost at least $245 million to replace all of the lines. (N.T. at 41, 47-48, R.R. at 11-12.) Thus, the Authority has been unable to replace its entire system of terra cotta lines due to the enormous cost involved. *Id.*

At the hearing, an expert in the field of civil engineering and sanitary sewage, Joseph Dietrick, testified on behalf of Landowner. (N.T. at 60, R.R. at 15.) Mr. Dietrick testified that, based on an investigation he undertook, it was his conclusion that the Property experienced sewage backups due to an excess of flow in the sewage system. (N.T. at 61, R.R. at 16.) More specifically, Mr. Dietrick stated that the problems associated with the Property occurred because of inflow and infiltration. (N.T. at 73, R.R. at 19.) He thought that the Authority should have implemented a program to deal with the issues on the Property and should have been able to resolve the issues. *Id.* Mr. Dietrick testified that it was his understanding that since the second check valve was installed around 2012, overflow in the area of the Property had been limited to a retention pond, which was separated from the building on the Property by a parking lot. (N.T. at 85, 95, R.R. at 22, 24.) Mr. Dietrick acknowledged that the Authority's lateral inspection program is intended to reduce inflow and infiltration problems. (N.T. at 88-89, R.R. at 22-23.) He also stated that the infiltration problems stem from the original installation of terra cotta pipes, which develop problems and deteriorate over time. (N.T. at 89, R.R. at 23.) He admitted that it would cost hundreds of millions of dollars to replace all of the terra cotta pipe lines and that the Authority's lateral inspection program is making progress in fixing inflow and infiltration issues. (N.T. at 90, R.R. at 23.) Mr. Dietrick further testified that the flooding on the Property was caused by problems occurring miles up the sewer line from the Property, and that

4

the Property had only experienced overflow problems when there had been significant rainfall. (N.T. at 90, 93, R.R. at 23-24.)

Landowner also testified. Landowner stated that the Property, which is a commercial rental property, was connected to the Authority's sewage system in 1968. (N.T. at 110-11, R.R. at 28.) He testified that the Property first experienced sewage problems in 2003, when sewage seeped up through the floor drains into the counseling office in the basement of the building on the Property. (N.T. at 111-12, R.R. at 28.) He explained that following that incident, several dump truck loads of sewage, carpeting, toilet paper, drywall, and baseboard were removed from the Property, and that the basement had to be rebuilt. *Id.*

Landowner testified that the Property next experienced sewage issues in 2007. By that time, a hairdresser occupied the remodeled basement space. (N.T. at 112, R.R. at 28.) Landowner stated that during the second incident, about six inches of water seeped up through the floor drain into the basement. Landowner was forced to remove the damaged carpeting, insulation, and drywall, replace the flooring, and disinfect, rebuild, and repaint the basement area. (N.T. at 113, R.R. at 29.) Thereafter, the Authority installed a check valve, which Landowner understood was intended to resolve the problem. (N.T. at 113, 116-17, R.R. at 29-30.) Landowner testified that during the next several rain storms, the check valve was dislocated by the rain and had to be reinstalled by the Authority. (N.T. at 117, R.R. at 30.) When the Authority reinstalled the check valve it modified the valve so that it would not become dislocated during a rainfall. (N.T. at 119, R.R. at 30.)

Landowner stated that the next sewage incident occurred in 2012. (N.T. at 119-20, R.R. at 30.) Again, the basement flooded from the floor drains, and Landowner had to disinfect and remove the baseboard, drywall, and insulation in the basement. *Id.* Landowner testified that after the 2012 incident, the Authority replaced the check valve with a "heavier duty" check valve that had a higher "PSI rating." (N.T.

at 121-122, R.R. at 31.) Landowner stated that after the Authority installed the more robust check valve there have been sewage overflows into a retention pond located on the Property. (N.T. at 122, R.R. at 31.) Landowner explained that the overflows into the retention pond occur on average four times per year. (N.T. at 123, R.R. at 31.) When the sewage overflows occur he is able to see toilet paper in the retention pond and there is an odor. (N.T. at 125, R.R. at 32.) On cross-examination, Landowner stated that there were no flooding incidents between 2007 and 2012 and that the 2012 incident occurred after Hurricane Sandy. (N.T. at 129, R.R at 33.) He also testified that since the Authority installed the heavier duty check valve in 2012 there has been no damage to the building on the Property. (N.T. at 129-130, R.R. at 33.)

Following the hearing, the trial court issued an order on July 23, 2019, sustaining the Authority's preliminary objections. In its opinion in support of its order, the trial court concluded that the instant matter was analogous to our decision in *In re Condemnation by the Youngwood Borough Authority* (Pa. Cmwlth., No. 203 C.D. 2014, filed December 5, 2014) (*Youngwood*) (unreported), wherein we concluded that a *de facto* taking had not taken place. (Trial court op. at 3.) The trial court observed that in *Youngwood*, the landowner alleged that a *de facto* taking occurred because its property was continuously flooded by sewage. The trial court noted that in that case the flooding had also resulted from inflow and infiltration of storm water into the sewage system, that the borough authority had developed a corrective plan to reduce infiltration and inflow, and that the harm that resulted to the property was not the intended consequence of a deliberate and purposeful drainage plan. *Id.* Like that case, the trial court found that, here, the damage to the Property resulted from illegal inflow by downspouts, French drains, etc. and by infiltration from cracked or broken pipes and severed joints. *Id.* at 4. Also, similar to the facts in *Youngwood*, the trial court found that the Authority had a corrective action plan to reduce infiltration and inflow, which involved inspections and repairs, that the Authority did not intend to allow

6

inflow and infiltration because it was detrimental to the sewage system, and that the Authority had made a good faith effort to fix the problem. (Trial court op. at 4.) Moreover, given the Authority's inspection program and the Authority's "inability to adequately separate the storm water from the sewage system despite [its] efforts to do so," the court found that "the Authority's actions were not part of a deliberate and purposeful drainage plan and were not related to or incidental to the use of [its] condemnation powers." *Id.* at 5.

The trial court distinguished this case from *Central Bucks Joint School Building Authority v. Rawls*, 303 A.2d 863 (Pa. Cmwlth. 1973), and *Hereda v. Lower Burrell Township*, 48 A.2d 83 (Pa. Super. 1946), wherein the Commonwealth Court and Superior Court, respectively, concluded that *de facto* takings had occurred because flooding was the direct consequence of the authorities' direct and purposeful decisions to alter their drainage plans. (Trial court op. at 4-5.) Contrasting the present matter with those cases, the trial court concluded that, here, the Authority did not take any direct or purposeful actions because "no lines were placed in a deliberate fashion that resulted in the flooding" of the Property. *Id.* at 5.

While Landowner urged the trial court to rely on our decision in *In re Mountaintop Area Joint Sanitary Authority*, 166 A.3d 553 (Pa. Cmwlth. 2017) (*Mountaintop*), the trial court concluded that that case was also distinguishable. (Trial court op. at 5.) The trial court observed that in *Mountaintop*, we concluded that a *de facto* taking had occurred because the authority chose to operate its system in a manner that would sporadically flood the landowner's property, that the authority made specific decisions that caused the flooding, including designing its system so that multiple sewage lines entered onto the property, and that the authority was aware of the adverse consequences of its action. (Trial court op. at 6-7.) Conversely, the trial court found that in the instant case, "nothing in the testimony presented demonstrate[d] the existence of purposeful and deliberate actions by the Authority." *Id.* at 7.

7

Therefore, the trial court concluded that it could not "rely on the *Mountaintop* case to reach a conclusion that the flooding at [Landowner's] property [was] an immediate, direct, necessary, and unavoidable consequence of the making of a public improvement by the Authority." (Trial court op. at 7.)

Landowner also argued that the Authority's decision not to spend the money to replace all of the terra cotta pipes, in order to eliminate inflow and infiltration, was a deliberate action taken by the Authority that established a *de facto* taking. *Id.* However, the trial court noted that Mr. Kaplan testified that it would cost $245 million to replace 245 miles of terra cotta pipes, and determined that the Authority was not making "an intentional choice for the purposes of establishing a deliberate and purposeful action required for a *de facto* taking merely because its board had not authorized the spending of millions of dollars to replace 245 miles of piping." *Id.* The trial court also concluded that "[i]f the Authority had the available funding, and chose not to use it to replace the pipes and eliminate all inflow and infiltration problems," then it "could potentially find that the flooding on the [Property] was deliberate and purposeful to meet the definition of a *de facto* taking." *Id.* Yet, the trial court determined that the Authority did "not even have the option of making that choice in the current matter because the evidence [did] not establish that the funding exists to put that choice on the table." *Id.* at 8.

> In sum, the trial court concluded as follows:

> Based on these facts, the Court finds more of a comparison to the facts of *Youngwood* than it does to *Mountaintop*, *Rawls* and *Hereda*. The Authority did not deliberately lay any new lines or make any deliberate choices that resulted in the flooding on [Landowner's] property. New piping was not laid to increase the flow, new customers were not added to increase the flow to [the Property], and there was no testimony that the design of the system itself created a situation of likely overflow at [the Property] as occurred in *Mountaintop*. No ditches or piping were redirected. No one

8

suggested that the piping was the wrong size, was cracked and ignored, or was failing to flow properly. Instead, all testimony agreed that the flooding was the result of the Authority's inability to eliminate inflow and infiltration into the sewage system, just as it was in the *Youngwood* case. And, as in *Youngwood*, the testimony clearly shows that the Authority has made good faith efforts to remediate the problem. Therefore, the flooding on [the Property] was the unintended consequence of the authority's inability to separate the storm water from the sewer system, which could potentially amount to a trespass, but does not satisfy the requirements to establish a *de facto* taking. As a result, [Landowner] has failed to meet its heavy burden and the Authority's preliminary objections to [Landowner's] request to appoint a board of viewers are sustained.

*Id.*

## Discussion

On appeal,[2] Landowner argues that the trial court erred as a matter of law and abused its discretion in sustaining the Authority's preliminary objections. Landowner contends that, pursuant to *Mountaintop*, 166 A.3d at 562, a series of sewage overflows on a property constitutes a *de facto* taking when sewage overflows are caused by the manner in which the authority chooses to operate its system. Under this standard, Landowner argues that in order to prove that a *de facto* taking occurred, he need only demonstrate that the overflows were caused by the Authority's intentional decisions regarding the operation of its system. Landowner asserts that the Authority

---

[2] "Our review of a trial court's decision to sustain or overrule preliminary objections to a declaration of taking in an eminent domain case is limited to determining whether the trial court abused its discretion or committed an error of law." *Beaver Falls Municipal Authority ex rel. Penndale Water Line Extension v. Beaver Falls Municipal Authority*, 960 A.2d 933, 936 (Pa. Cmwlth. 2008).

9

was aware that overflows on the Property were still occurring and that the Authority failed to undertake the necessary maintenance and upgrades required to prevent the Property from serving as a pressure release valve for the Authority's system.

Landowner maintains that the Authority's decision to not repair and remediate the issues causing overflows on the Property, because the Authority decided the issues were too expensive to repair, was part of a purposeful and deliberate drainage plan. Landowner contends that despite the Authority's efforts to resolve the overflow problems on the Property, overflows are still occurring outside the building in the retention pond, which was installed for storm water purposes, rather than sewage overflows. Thus, Landowner alleges that the Authority has deliberately "chosen to operate its system in such a manner as to cause sanitary sewage overflows to occur on [the Property] as a deliberate alternative to spending the necessary funds to correct the infiltration issues [a]ffecting the system as a whole, or the part of the system at issue." (Landowner's Br. at 13.) Landowner further argues that he "has lost the use of a portion of [the Property], and suffered damages including but not limited to lost ability to raise rents, lost tenants, odors, lost property values, and other damages." (Landowner's Br. at 14.) Landowner also contends that the trial court erred in relying on *Youngwood* instead of *Mountaintop*. Landowner asserts that, like *Mountaintop*, the Authority had knowledge of the issues on the Property and engaged in "ad hoc" remedies that did not resolve the problem. (Landowner's Br. at 15.)

Finally, Landowner argues that the trial court erred in finding that the overall cost and practicality of remediating the system was relevant. Landowner maintains that the Authority's decision to not spend the necessary funds to remediate the system was a deliberate decision and that whether or not it might have been cost prohibitive to make the repairs was not relevant to the trial court's determination regarding a *de facto* taking.

10

In contrast, the Authority claims that the trial court correctly relied on *Youngwood* rather than *Mountaintop*. The Authority asserts that, like *Youngwood*, where flooding was also caused by inflow and infiltration and where the local authority attempted to fix the problem, the trial court properly analogized that case to the present situation to conclude a *de facto* taking had not occurred.

The Authority further alleges that the trial court's decision was supported by substantial evidence. The Authority contends that the evidence established that inflow and infiltration caused the overflow problems on the Property and that the Authority had an inspection and repair program in place to try to remediate the problem.

Additionally, the Authority asserts that for a *de facto* taking to occur, the resulting injury must be the immediate, direct, necessary, and unavoidable consequence of the exercise of an eminent domain action and, therefore, recovery may not be obtained through eminent domain proceedings where the injury resulted from a trespass or from negligent acts committed by the condemning body. The Authority contends that because the harm to the Property was the unintended consequence of its inability to adequately separate storm water from sewage and was not part of a deliberate and purposeful drainage plan, the proper action lies in trespass rather than eminent domain. The Authority also alleges that its good faith effort to correct the inflow and infiltration problems demonstrates that it was not its intention to allow the same.

Finally, according to the Authority, the trial court did not improperly rely upon evidence of the cost of replacing the terra cotta pipes; instead, the trial court discussed the high cost of remediation in relation to Landowner's argument that the decision to not expend such funds was a deliberate action. The Authority asserts that the trial court concluded that the Authority's decision was not deliberate, in part, based on the lack of evidence that the Authority had the necessary funding to replace the terra cotta pipe system.

11

A landowner asserting that a *de facto* taking has occurred bears a heavy burden of proof. *Griffith v. Millcreek Township*, 215 A.3d 72, 75 (Pa. Cmwlth. 2019), *appeal denied*, 223 A.3d 660 (Pa. 2020). In particular, the landowner must allege and prove the following elements:

> (1) [the] condemnor has the power to condemn the land under eminent domain procedures; (2) exceptional circumstances have substantially deprived the [landowner] of the use and enjoyment of the property; and (3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the power of eminent domain.

*Id.* Thus, "[a] *de facto* taking must result from the governmental body's actual exercise of the power of eminent domain." *Id.* Accordingly, "an injury which is not the immediate, direct, necessary, and unavoidable consequence of the making of a public improvement by an entity having the power of eminent domain is not a *de facto* taking." *Appeal of Kehler*, 442 A.2d 409, 410 (Pa. Cmwlth. 1982).

Moreover, "'a *de facto* taking requires that the injury complained of [be] a direct result of *intentional action* by an entity incidental to its exercise of its eminent domain power.'" *Griffith*, 215 A.3d at 75 (emphasis in original) (quoting *Mountaintop*, 166 A.3d at 562). Conversely, "where injuries result from the *negligence* of a condemning body's agents, there is no *de facto* taking." *Griffith*, 215 A.3d at 75 (emphasis in original); *see also McMaster v. Township of Bensalem*, 161 A.3d 1031, 1037 (Pa. Cmwlth. 2017) (holding that, typically, "where a landowner suffers specific damage to his property as a result of the negligent acts of a party with the power of eminent domain, the proper action lies in trespass"); *Appeal of Jacobs*, 423 A.2d 442, 443-44 (Pa. Cmwlth. 1980) (holding that "[n]o recovery may be obtained through eminent domain proceedings where the injury resulted from trespass and no *de facto* taking may result from negligent acts committed" by the condemning body).

As pertains to the instant matter, generally "where the evidence shows that the flooding of land and buildings is the direct and necessary consequence of the [condemning body's] drainage plan . . . there is a *de facto* taking." *Greger v. Canton Township*, 399 A.2d 138, 140 (Pa. Cmwlth. 1979); *see also Griffith*, 215 A.3d at 76 (holding that courts are more likely to find a taking where the action complained of was part of a purposeful and deliberate drainage plan). In *Youngwood*,[3] which the trial court relied on to reach its decision, the landowner, a nonprofit corporation that operated a local railroad museum and café (Museum), filed a petition for appointment of a board of viewers alleging that the local sewer authority's sewer line became overloaded and flooded the Museum's basement with feces, toilet paper, effluent, and blackened water having a strong odor. *Id.*, slip op. at 1-2. At a hearing on preliminary objections, the Museum's president testified that sewage flooded the basement whenever it rained heavily or steadily for several days. *Id.*, slip op. at 2-3. An engineer who worked for the local authority testified that although the sewage system was only intended to collect sewage, and not storm water, infiltration occurred when storm water entered into the system's aging terra cotta clay pipes. *Id.*, slip op. at 4. He explained that the local authority had a collective action plan to reduce infiltration and inflow into the sewage system. *Id.* The trial court sustained the local authority's preliminary objections because it concluded that the local authority had not acted deliberately or intentionally and therefore, that no recovery could be maintained through eminent domain proceedings. *Id.*, slip op. at 4-5.

On appeal, we concluded that the trial court had correctly concluded that a *de facto* taking had not occurred because the local authority's actions "were not purposeful and deliberate" and because it "made good faith efforts to correct the storm

---

[3] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of the Court filed after January 15, 2008, may be cited for its persuasive value. 210 Pa. Code §69.414(a).

water and sanitary sewage overload problem." *Id.*, slip op. at 7. We further held that the landowner's harm "was merely the unintended consequence of the [local authority's] inability to adequately separate the storm water from the sanitary system[,] despite [its] efforts to do so, and was *not part of a purposeful and deliberate drainage plan* nor related to or incidental to [its] condemnation powers." *Id.* (emphasis added).[4]

Conversely, Landowner argues that the trial court should have relied on *Mountaintop* because it is more analogous to the instant matter factually. In *Mountaintop*, the landowner's home and lawn were flooded with sewage on several occasions between 2006 and 2011. 166 A.3d at 555. The landowner filed a petition for appointment of a board of viewers, alleging that a *de facto* taking had occurred because the local authority knew that its sewage system was prone to overloads that would cause flooding onto her property and that, despite this knowledge, allowed additional properties to connect to the system, thereby increasing the number of overloads. *Id.* at 556. At a hearing on preliminary objections, the local authority's executive director testified that the authority's customer base had increased every year from 2007 through 2011. *Id.* He also testified that there were two manholes on the landowner's property, that several different sewer lines connected at the two manholes, and that the sewage exited the manholes from a single line. *Id.* at 557. In sum, sewage entered the manholes by multiple sewer lines, but exited by a single line. *Id.* The

---

[4] *See also Griffith*, 215 A.3d at 76-77; *Appeal of Kehler*, 442 A.2d at 409-10. In *Griffith*, a landslide, which rendered a landowner's home uninhabitable, was caused by the township's storm water system's erosion of a ravine adjacent to the home. 215 A.3d at 76-77. We concluded that a *de facto* taking had not occurred because, although the township may have been negligent in the maintenance and operation of the storm water system, the landslide did not result from any intentional actions taken by the township. *Id.*

Likewise, in *Appeal of Kehler*, we concluded that because the flooding of sewage into the basement of a dwelling resulted from an obstruction by foreign matter in the sewer line serving the dwelling, the flooding was "not the necessary and unavoidable consequence of the presence of the township's sanitary sewer main in the street abutting the dwelling" and, thus, a *de facto* taking had not occurred. 442 A.2d at 409-10.

14

executive director additionally testified that the slope of the sewer lines entering the two manholes was steeper than the slope of the single exit pipe leaving the manholes. *Id.* Therefore, sewage entered the manholes at a faster rate than it could exit. *Id.* Due to the "design capacity" of the sewage system, overflow events occurred when wastewater filled the barrel of the manhole and exited the sewage system completely. *Id.* The landowner testified that on several occasions, the lower level of the house was flooded with knee-deep sewage. *Id.* at 558. She stated that the local authority attempted to fix the problem several times by plugging the sewer lines with "balls." *Id.* at 559.

Based on this testimony, the trial court concluded a *de facto* taking occurred because the flooding resulted from the "manner in which the [local authority] chose to operate its system." *Id.* at 562. On appeal, we agreed with the trial court, concluding that "[s]pecific decisions of the [local authority] caused the overflow events and [it] was aware of the adverse consequences of those decisions." *Id.* at 563. We based our decision on the fact that the local authority "*decided* to expand its customer base from 2007 through 2011 and increase the volume of sewage flowing through its system"; that the local authority "*designed*" the two manholes "to have sewage enter from multiple steep-sloped manholes but exit through a single, narrower, and less-sloped exit line"; and that "these decisions alone affected the amount of sewage flowing through [the local authority's] system and increased the likelihood of overflow events occurring on [the landowner's] property." *Id.* (emphasis added). We also based our decision on the fact that the local authority was aware of the likelihood of overflow events and that, "[d]espite this knowledge, the [local authority] did not take appropriate steps to remedy the structural defects," but instead pursued *ad hoc* remedies. *Id.* Thus, we held that the flooding was the "direct result of intentional action" taken by the local authority incidental to its eminent domain power. *Id.*

15

Moreover, we determined that the case was distinguishable from *Youngwood*. *Mountaintop*, 166 A.3d at 563. We concluded that unlike in *Youngwood*, where "there was no finding the landowner's harm derived from 'a purposeful and deliberate drainage plan,'" in the case before us the trial court specifically found that the overflow onto the landowner's property "resulted from the *manner* in which the [local authority] operated its system." *Mountaintop*, 166 A.3d at 563 (emphasis added) (quoting *Youngwood*, slip op. at 7).[5]

Because the facts, here, are more akin to *Youngwood* than to *Mountaintop*, we conclude that the trial court properly relied on the former case to conclude that a *de*

---

[5] *See also Brown v. Pennsylvania Turnpike Commission* (Pa. Cmwlth., No. 235 C.D. 2018, filed January 7, 2019) (unreported); *Rawls*, 303 A.2d at 864; *Hereda*, 48 A.2d at 83-85. In *Brown*, the Pennsylvania Turnpike Commission (Commission) undertook a widening project, which significantly changed the grade of the turnpike and increased the flow of storm water. *Brown*, slip op. at 3. In order to control the flow of storm water, the Commission constructed a retaining wall, drainage pipe, and "riprap swale" to collect storm water runoff, which resulted in the runoff being discharged onto the landowner's property. *Id.*, slip op. at 3, 16. Following the widening project, storm water flow was concentrated at a specific point on the landowner's property and increased by 500%. *Id.*, slip op. at 3, 7. On appeal, we held that a *de facto* taking had occurred because the evidence supported the trial court's determination that the injury to the property was the "immediate, necessary and unavoidable consequence[] of [the Commission's] construction project, which *intentionally* diverted a greatly *increased* and *concentrated* storm[]water flow directly onto" the landowner's property. *Id.*, slip op. at 17 (emphasis in original). We concluded that the Commission's "construction project created a drainage system that *intentionally* discharged a greatly increased and concentrated flow of storm[]water onto the rear" of the landowner's property. *Id.*, slip op. at 18 (emphasis in original).

Likewise, in *Rawls*, the local authority installed a 27-inch diameter pipe that emptied into a stream that flowed onto the landowner's property. 303 A.2d at 864. The emptying of the pipe into the stream caused an increased quantity of effluent that flooded the landowner's property, unpleasant odors, and erosion of the stream bank. *Id.* We held that a *de facto* taking had occurred because the flooding was the direct and necessary consequence of the authority's intentional action of installing the 27-inch pipe. *Id.* at 866-67.

Further, in *Hereda*, the flooding of sewage onto the landowner's property resulted from the township's decisions to install a 55-foot-long, 18-inch diameter steel pipe ending at the landowner's property and close a ditch, adjacent to the property, which had previously collected storm water. 48 A.2d at 83. The Superior Court concluded that because the injury to the property "resulted from the consummation of [the township's] drainage plan" and the water and sewage would not have diverted and discharged onto the property, but for the township's actions, such injury was "the direct, immediate, necessary, and unavoidable consequence of the exercise" of the township's eminent domain power. *Id.*

16

*facto* taking had not occurred. By all accounts, when the Authority first constructed its sewage system in 1968-69 using terra cotta/clay pipes, the system operated as intended. However, since 2003, the Property has been flooded by sewage on several occasions. Mr. Kaplan testified that the flooding on the property was caused by infiltration and inflow of storm water into the system. Infiltration occurs when the terra cotta pipes crack, break and separate, due to aging, and inflow occurs when landowners illegally connect downspouts and other drains into the sewage system. Mr. Kaplan stated that inflow and infiltration can overwhelm the sewage system because it results in an excess of storm water entering the system during rain events. According to Mr. Kaplan, the Authority did not intend to allow infiltration and inflow, because it is detrimental to the sewage system, and began a lateral inspection program to identify and repair infiltration and inflow problems. With respect to the Property, the Authority installed a check valve that eventually stopped the flooding of the basement on the Property; however, sewage still flows into the retention pond on the Property several times a year. Mr. Dietrick, an expert who testified on behalf of Landowner, also acknowledged that the flooding on the Property occurred due to inflow and infiltration.

Because the facts, here, are nearly identical to those in *Youngwood*, we hold that the trial court correctly determined that the Authority's actions did not constitute a *de facto* taking. Like *Youngwood*, the flooding of the Property was caused by the inflow and infiltration of storm water into the Authority's older terra cotta pipe sewage system, the Authority did not intend to allow storm water to enter its sewage system, and the Authority developed a program to try to eliminate inflow and infiltration. Thus, similar to *Youngwood*, because the Authority's "actions were not purposeful and deliberate" and because the Authority "made good faith efforts to correct the storm water and [] sewage overload," we conclude that a *de facto* taking did not occur. *Youngwood*, slip op. at 7. Indeed, as in that case, the injury to the Property was "merely the unintended consequence of the Authority's inability to adequately

17

separate the storm water from the [sewage] system," despite the Authority's efforts to remedy the problem, and was "not part of a purposeful and deliberate drainage plan." *Id.* The facts in the instant case are also comparable to the situation in *Appeal of Kehler*, where flooding resulted from a sewer pipe being blocked by a foreign material, rather than an intentional action.

Moreover, we agree with the trial court that the facts, here, are significantly distinguishable from *Mountaintop* and the other cases where flooding resulted from *deliberate and purposeful* drainage plans. In *Mountaintop*, the flooding resulted from the local authority's decision to design the sewage system in such a way that several steep-sloped sewer lines converged at the landowner's property, but only exited through a single less-sloped exit line, and from its decision to expand its customer base and, thus, increase the volume of sewage in the system. We held that a *de facto* taking occurred because the flooding resulted from the intentional "manner in which the local authority chose to operate its system." *Mountaintop*, 166 A.3d at 563. Similarly, in *Brown*, *Rawls*, and *Hereda*, we concluded that *de facto* takings had occurred because flooding resulted from the condemning bodies' intentional operation, design, and/or installation of their drainage and sewage systems.

Unlike those cases, here, the flooding of Landowner's property did not occur due to a deliberate and purposeful drainage plan, but rather, stemmed from the Authority's inability to eliminate the inflow and infiltration problems arising from the deterioration of its aging terra cotta pipe system. Therefore, because the injury to Landowner's property was not the "direct result of *intentional* action by [the Authority] incidental to its exercise of its eminent domain power," we hold that a *de facto* taking did not take place.[6] *Griffith*, 215 A.3d at 75.

---

[6] While we conclude that Landowner could not obtain recovery through eminent domain proceedings, we do not address or decide the separate questions of whether the Authority's actions were negligent or whether Landowner can seek redress through a trespass or similar action.

We also conclude that the trial court did not err in examining the cost of remediation of the Authority's terra cotta pipe sewage system. While Landowner asserts that the cost of replacing the sewage system was not relevant to determining whether a *de facto* taking occurred, as argued by the Authority, the trial court only addressed the cost of remediating the system in relation to Landowner's argument, made before the trial court, that the Authority's decision to not replace the pipes was a deliberate action that established a *de facto* taking.

Our review of the trial court's opinion confirms that the trial court discussed the cost of replacing the pipes in relation to Landowner's arguments. In response to Landowner's contention that the Authority's decision to not replace the pipes was a "deliberate action taken by the [A]uthority," the trial court noted that Mr. Kaplan testified that the sewage system consisted of "245 miles of sewer, most of which [were] terra cotta or clay pipes, and [that] removing all of them would be large scale and cost over 245 million dollars." (Trial court op. at 7.) The trial court concluded that the Authority "was not making an intentional choice for the purposes of establishing a deliberate and purposeful action required for a *de facto* taking merely because its board had not authorized the spending of millions of dollars to replace 245 plus miles of piping." *Id.* The trial court found that "[i]f the Authority had the available funding, and chose not to use it to replace the pipes and eliminate all inflow and infiltration problems, then [the] [c]ourt could potentially find that the flooding on [the Property] was deliberate and purposeful to meet the definition of a *de facto* taking." *Id.* Nonetheless, the trial court determined that the Authority "did not even have that choice in the current matter because the evidence [did] not establish that the funding exist[ed] to put that choice on the table." *Id.* at 8.

Because the trial court only considered the cost of replacing the sewage system as part of its general analysis into whether the flooding resulted from a deliberate or purposeful action taken by the Authority, we discern no error.

19

## Conclusion

Accordingly, because we conclude that a *de facto* taking did not occur, we affirm the order of the trial court.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In the Matter of:  Condemnation by  :
the Franklin Township Sewage     :
Authority of Property of William Ott,  :
Situate in the Municipality of      :   No.  1237 C.D. 2019
Murrysville, Westmoreland County,  :
Pennsylvania                   :
                               :
Appeal of:  William Ott         :

## *ORDER*

AND NOW, this 8th day of June, 2020, the July 24, 2019 order of the Court of Common Pleas of Westmoreland County is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge