IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Somera Road – 835 West Hamilton Street, LLC, | : | |
| Appellant | : | |
| | : | No. 568 C.D. 2019 |
| v. | : | |
| | : | Argued: June 9, 2020 |
| City of Allentown | : | |

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                                                 FILED: August 25, 2020


Somera Road – 835 West Hamilton Street, LLC (Appellant) appeals from the April 12, 2019 order of the Court of Common Pleas of Lehigh County (trial court) granting summary judgment in favor of the City of Allentown (City) on a claim for a *de facto* taking. The City has filed a motion to dismiss and/or quash the appeal. For the reasons that follow, we dismiss the appeal.


**Background**

Plaza at 835 West Hamilton Street (Plaza) was the former owner of a multi-story commercial Class A office space building in the downtown area of Allentown, Lehigh County, Pennsylvania, commonly known as the "PPL Plaza"

(Property or Building).[1]  On October 27, 2017, Plaza commenced this action in the trial court by filing a petition for the appointment of a board of viewers pursuant to section 502(c) of the Eminent Domain Code (Code),[2] 26 Pa.C.S. §502(c).  Plaza alleged that the City effectuated a *de facto* taking because it engaged in a course of conduct that caused Plaza to lose a major tenant and sustain a substantial impairment to the value of the Property.

In an apt and able manner, the trial court set forth the factual and procedural history of this case as follows:

> The [B]uilding in question was originally constructed in 2005.  [Plaza] was not the original builder, but purchased the [Property and] structure in November 2006 for $92 million.  At the time of acquisition, [Plaza] paid $13 million in cash, and financed the remaining balance of the purchase price through two loans.  One loan was for $75 million, while the second loan was in the amount of $7 million.  There was a balloon payment provision for any outstanding balance to be paid in full by December 1, 2016.
>
> At the time of purchase, certain pre[]existing leases of office space within the building were already in place.  The largest tenant in terms of square footage and total amount of rent paid was PPL Energy Plus Corporation (PPL), and its successor, Talen Energy Corporation (Talen).  The original lease began on April 30, 2003, and ran until April 30, 2018.  In December 2014, PPL unsuccessfully attempted to renegotiate the base rent with [Plaza].  PPL also offered to purchase the building outright from [Plaza] in January 2015 for $41 million, but [Plaza] rejected the offer.  In June 2015, PPL spun off [and formed into the corporate entity,] Talen.  Talen subsequently assumed the lease rights from PPL for

---

[1] As explained *infra*, Appellant later became the owner.

[2] 26 Pa.C.S. §§101-1106.

2

the portion of [the] [P]roperty which PPL rented, with a unilateral right to extend the lease to 2038.

In 2015, Talen and [Plaza] began discussions about an extension of Talen's lease. As the negotiations proceeded, Talen was also being wooed to move out of [Plaza's] property to another location. These alternate sites included office space in Bethlehem, Pennsylvania and Phillipsburg, New Jersey. However, there was significant pressure to retain Talen as a tenant in Class A office space in Allentown, and particularly within a 127.5[-]acre designated area within Allentown, referred to as the Neighborhood Improvement Zone [(NIZ) Zone].

The NIZ [Zone] was created by legislation enacted in 2011 for the purpose of energizing economic development in certain portions of downtown Allentown and along the riverfront abutting the Lehigh River. Although [the Allentown Neighborhood Improvement Zone Development Authority (ANIZDA)] was created by the enactment of a municipal ordinance, ANIZDA itself is deemed a "public instrumentality of the Commonwealth." [Section 6(a) of Economic Development Financing Law (Economic Development Law),[3] 73 P.S. §376(a)]. As a Commonwealth instrumentality, ANIZDA is a separate and distinct agency from the [City].

According to the authorizing statute and city ordinance, ANIZDA was empowered by law to undertake activities, including issuance of loans, in order to facilitate and advance the development of real estate parcels in [the NIZ Zone, which is] a strictly configured area within the [City]. However, **ANIZDA was not endowed with condemnation or eminent domain powers**. [*See* 73 P.S. §376(b) (enumerated express grants of rights and powers); *see also* the Neighborhood Assistance Act, located in Article XIX-A, Sections 1901-A – 1909-A, of the Tax Reform Code of 1971 (Tax Code), Act of March 4, 1971, P.L. 6, *as amended*, added by the Act of June 16, 1994, P.L. 279, 72 P.S. §§8901-A – 8908-A, and the act commonly referred to

---

[3] Act of August 23, 1967, P.L. 251, *as amended*, 73 P.S. §§371-386.

as the NIZ Law, located in Article XIX-B, Sections 1901-B – 1909-B, of the Tax Code, added by the Act of July 9, 2013, P.L. 270, 72 P.S. §§1901-B – 1909-B.] ANIZDA promulgated certain guidelines to establish the procedure and criteria by which the agency would evaluate loan applications for funds to support economic development projects within the confines of the NIZ [Law]. Among the criteria was a requirement that any project seeking ANIZDA-approved funds was limited to any new construction or renovation and improvements of existing structures within the NIZ. [Section 1904-B of the Tax Code, 72 P.S. §8904-B(a), (e)(1)[4]]. [Plaza's] [P]roperty was constructed in 2005, well before enactment of the NIZ legislation, but the [P]roperty is set within the boundaries of the NIZ [Zone].

The innovative concept behind the NIZ [Law] was a provision that allowed for the segregation of state revenue generated by existing businesses and their employees within the specific confines of the NIZ [Zone]. Those state revenues, drawn from state income, sales, cigarette taxes, etc., were used to support the issuance of bonds to pay for the construction of the centerpiece of the economic revival of downtown Allentown, a sports and entertainment venue known as the PPL Center. [*See generally Allentown Neighborhood Improvement Zone Development Authority v. City of Allentown* (C.C.P. Lehigh Nos. 2015-C-1488, 1489, 1490, and 490, filed May 20, 2016); *see also* sections 1902-B, 1903-B of the Tax Code, 72 P.S. §§8902-B (defining

---

[4] This provision states that following the designation of a NIZ Zone, an authority, such as ANIZDA, shall notify the State Treasurer of the designation, and the State Treasurer shall establish a special fund for the benefit of each authority to be known as the NIZ Fund. Section 1904-B of the Tax Code, 72 P.S. §8904-B(a). The money may be used by the authority "[f]or payment of debt service, directly or indirectly through a multitiered ownership structure or other structure authorized by [an] authority to facilitate financing mechanisms, on bonds or on refinancing loans used to repay bonds issued to finance or refinance . . . the improvement and development of all or any part of the neighborhood improvement zone; and . . . the construction of all or part of a facility or facility complex." 72 P.S. §8904-B(e)(1)(i)(A)-(B). *See also* 73 P.S. §376(b)(14) (vesting an authority with the power "[t]o do all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority, to carry out and exercise the purpose of and the powers granted by this act or any other acts").

"facility" and "facility complex," in large part, as and/or with reference to an "a stadium, arena[,] or other structure owned or leased by a professional sports organization), 8903-B ("The [] authority may designate a [NIZ Zone] of not greater than 130 acres in which a facility or facility complex may be constructed and may borrow funds for the purpose of improvement and development within the [NIZ Zone] and construction of a facility or facility complex within the zone.")]

To manage this economic revitalization, the legislation authorized the appointment of an oversight board known as [ANIZDA (ANIZDA Board)]. As stated above, the ANIZDA [B]oard was permitted by the NIZ [Law] to issue bonds to fund the construction of the arena. The funding needed to support the issuance of the bonds was predicated upon a dedication of state tax revenue from existing businesses within the NIZ [Zone], primarily from PPL Energy Plus, and its successor, Talen Energy [(Talen)]. For example, Talen alone contributed $13.7 million per year in NIZ taxes, almost the entire amount necessary to pay the $15.3 million annual debt for the arena.

Without the state revenue specifically drawn from Talen and its employees, the funding necessary to support the bonds issued by ANIZDA to pay for the construction of the hockey arena could be endangered. As a result, Talen's consideration of whether [] to remain as a tenant of [Plaza's] [P]roperty took on an added significance to the ANIZDA [B]oard and the Mayor of Allentown, Edward Pawlowski [(Mayor)], to ensure the viability and continued success of the economic revitalization of Allentown.

In addition, the [NIZ Law] authorized the use of any state taxes generated from new businesses which came into the NIZ [Zone] to finance the construction or renovation of existing structures for those same new businesses, including other Class A office space. These subsidized construction loans enabled owners of newly built or renovated properties within the NIZ [Zone] to offer square footage rental rates below prevailing market rates, and thereby created a competitive disadvantage for any existing Class A office space within or outside of the boundaries of the NIZ [Zone].

5

As the negotiations continued between Talen and [Plaza], the leadership of ANIZDA and [the] Mayor [] were in frequent contact with Talen's CEO, Paul Farr, about retaining Talen as a tenant within the NIZ [Zone]. Talen's continue[d] presence in the NIZ [Zone] took on crucial importance due to the reliance by the ANIZDA [B]oard upon the state revenues generated by Talen's employees.

Despite substantial efforts by [Plaza] to retain Talen as a tenant, in August 2017, Talen gave notice in August 2017 that it was not going to extend its lease of [Plaza's Building] past the expiration date in April 2018. However, even before Talen rejected an extension of its lease, [Plaza] was unable to make its balloon mortgage payment in December 2016. As a result, the mortgagee Wells Fargo Bank, N.A. [(Lender)] initiated mortgage foreclosure proceedings. While [Plaza] has conjoined the two events as being factually intertwined, it is important to observe that [Plaza] was not able to pay the balloon payment in December 2016 *even while Talen was a tenant of the subject premises*.

On December 6, 2017, the undersigned entered an order granting [Lender's] motion for judgment on the pleadings in the mortgage foreclosure action, and set a date for a hearing on damages.

[Plaza] has not proposed to construct a new facility, or renovate or improve the current facility. As a result, [Plaza] is statutorily precluded from applying for and obtaining any of the taxpayer-subsidized loans from ANIZDA. Ironically, [Plaza's] [P]roperty was the beneficiary under previous legislation as being located within a "Keystone Opportunity Zone" that provided for an abatement of property taxes for a limited time period as an inducement for real estate development in certain urban areas.

[Plaza] contends the subsidized construction loans that are available through the ANIZDA approval process have in turn depressed competing square foot rental rates in those newly constructed Class A office space facilities. Existing commercial rental locations which predated the enactment

6

of the NIZ, or which carry too high a debt load to enable the property owners to lower their rental rate, cannot compete against the subsidized square foot rental rates.

[Plaza] argues the consequential erosion of its competitive position amounted to an unlawful *de facto* taking or condemnation by the City of Allentown . . . because of the participation by [it] in the authorization or implementation of the NIZ-related tax collection. [Plaza] alleges that the City [] engaged in a *de facto* taking of its property by the failure of [the] former Mayor [] and other city officials to take steps necessary to prevent Talen from vacating [Plaza's] premises, and by encouraging Talen to relocate to another property in the NIZ [Zone] which was able to offer substantially less expensive rental rates due to NIZ [Law] subsidies.

[Plaza] filed its Petition for the Appointment of a Board of View[ers] on October 17, 2017. [Plaza] claims a Board of View[ers] needs to be appointed to determine the financial value of [Plaza's] property. This figure would then be used to calculate the amount of damages owed by [the City] to [Plaza]. [The City] filed Preliminary Objections on December 22, 2017. On March 22, 2018, the [trial court] filed an Order with an accompanying Memorandum Opinion overruling the [City's] preliminary objections and directing the parties to engage in discovery. The [trial court] set a hearing date for September of 2018, but due to the filing of several discovery-related motions, the hearing date was postponed . . . .

On January 31, 2019, [the City] filed the instant Motion for Summary Judgment. [Plaza] filed it response on February 20, 2019, and the [trial court] heard oral argument on the motion on March 12, 2019, at which time [it] took the matter under advisement.

(Trial court op. at 3-8) (italicized emphasis in original, bold emphasis added) (internal citations omitted).

By opinion and order dated April 12, 2019, the trial court granted the City's motion for summary judgment and dismissed Plaza's petition for the

7

appointment of a board of viewers. In its opinion, the trial court emphasized that it granted Plaza wide latitude to engage in discovery and required the City to produce numerous documents and email correspondence between the Mayor, the Chairman of the ANIZDA Board, the City's Director of the Office of Community and Economic Development (Director of Economic Development), and the Chief Executive Officer of Talen. The trial court then surveyed the evidence and explained that Plaza failed to establish that the City, or any of its employees, including the Mayor, or the ANIZDA Board, took action that was intended to harm Plaza.[5] In addition, the trial

---

[5] For instance, the trial court noted that "[t]he emails and deposition testimony amply illustrate the efforts undertaken" by the Mayor, the Director of Economic Development, and the Chairman of the ANIZDA Board "to find an attractive enough incentive package to convince [] Talen to keep its corporate headquarters and the hundreds of employees who worked for Talen at [Appellant's] property, or alternatively, within the NIZ [Zone]." (Trial court op. at 10.) The trial court further explained that

> [t]he predominant concern for [these] individuals was not so much the continued presence of Talen at [Appellant's] property, but to retain Talen at any location in the NIZ [Zone]. This endeavor was the focus of these individuals not because they wished to harm [Appellant], but because it was critical to the financial success of the NIZ [Law and Zone] to retain Talen, its hundreds of employees, and the commensurate millions of dollars in state revenue flowing to the ANIZDA to support the bonds that financed the construction of the hockey arena . . . . To put it bluntly, ANIZDA could survive without [Appellant's] property being rented, but it could not easily absorb the loss of Talen and its associated stream of tax dollars.

> Despite the fairly unbridled expanse of discovery permitted by the Court, [Appellant] has been unable to present any evidence that the Mayor intervened to persuade Talen to vacate [Appellant's] premises. At most, the discovery materials reveal that the Mayor did not successfully cajole legislators to enact separate alternative funding so that [Appellant] could also [be] offer[ed] subsidized commercial rental rates, and the Mayor did not persuade the ANIZDA [B]oard to provide financial assistance to [Appellant].

**(Footnote continued on next page…)**

8

court noted that ANIZDA and its Board were separate and distinct governmental entities from the City; the ANIZDA Board had control over the NIZ funds, but was not named as a party in this suit; and, importantly, the ANIZDA Board does not have eminent domain powers. The trial court found that Plaza failed to come forward with sufficient evidence to establish that the City, the Mayor, or any of its employees committed conduct that could be deemed as a causal or contributing factor in Plaza's loss of Talen as a tenant. Finally, the trial court pointed out that, before Talen decided not to sign a lease extension, Plaza was not financially able to fulfill its mortgage obligations and Lender instituted mortgage foreclosure proceedings. Therefore, the trial court granted summary judgment in favor of the City and dismissed Plaza's petition with prejudice.

Meanwhile, as noted above, while the eminent domain proceedings were pending before the trial court, on August 7, 2018, the trial court entered an *in rem* judgment in the foreclosure action against Plaza and in favor of Lender in the amount of $69,485,302.36. Pursuant to the terms of the mortgage and security agreement between Plaza and Lender, Plaza, as result of the judgment in foreclosure entered against it, transferred and/or assigned to Lender all of the causes of action that Plaza had with respect to the Property. Arguably, the transfer and/or assignment included Plaza's *de facto* claim in the eminent domain proceedings. Thereafter, on November 15, 2018, Lender assigned and/or transferred the mortgage judgment to Appellant, along with all the corresponding rights in the mortgage and security agreement. After the trial court entered summary judgment against Plaza on April 12, 2019, on April

---

**(continued…)**

(Trial court op. at 10-11.)

9

26, 2019, a sheriff's sale was held on the Property. At the sheriff's sale, Appellant purchased the Property for approximately $16 million, and the sheriff issued a new deed within 60 days. (Reproduced Record (R.R.) at 2432a-2435a.)

On May 8, 2018, Appellant filed a "Praecipe for Substitution of Successor Petitioner" with the prothonotary of the trial court. Appellant asserted that it was the present holder of the mortgage foreclosure judgment and mortgage and security agreement and, also, the owner of the Property. Therefore, Appellant contended that it was "the successor party to Plaza," "possesse[d] the right to pursue Plaza's claims in the instant action," and was and is "the current party at interest in this [e]minent [d]omain [a]ction." (R.R. at 2434a.)

On May 9, 2019, Appellant filed a notice of appeal to this Court. On October 9, 2019, the City filed an application to quash and/or dismiss, contending that Appellant failed to establish that it was a "successor" for purposes of Pa.R.C.P. No. 2352(a), and that Appellant, as a purchaser of the Property after an alleged *de facto* taking had occurred, does not have standing to appeal the order entering summary judgment against Plaza. Appellant filed an answer on October 23, 2019, emphasizing that under the law, it has special rights as an assignee of a cause of action pursuant to the mortgage documents and mortgage judgment. By *per curiam* order dated November 12, 2019, this Court deferred ruling on the City's application to quash and/or dismiss and ordered that it be listed with the merits of the appeal.

**Discussion**

On appeal, Appellant contends that the trial court erred in granting summary judgment in favor of the City. However, before we can delve into the

10

merits of this contention, we must initially address the City's motion to dismiss for lack of standing.

Under Pa.R.C.P. No. 2352(a), titled "Substitution of Successor," a "successor may become a party to a pending action by filing of record a statement of the material facts on which the right to substitution is based." *Id.* In turn, Pa.R.C.P. No. 2351 states that a "successor" is "anyone who by operation of law, election or appointment has succeeded to the interest or office of a party to an action." *Id.*

However, under Pennsylvania law, Appellant "cannot claim damages for a *de facto* taking which, if it happened at all, occurred prior to the time it became the owner of the property." *Snap-Tite, Inc. v. Millcreek Township*, 811 A.2d 1101, 1105 (Pa. Cmwlth. 2002); *see also Fidelity-Philadelphia Trust Co. v. Kraus*, 190 A. 874, 876 (Pa. 1937) (stating that "[t]he right to the damages resulting from the [condemnation] did not pass to [the purchaser] by the sale; the right is personal and does not run with the land"). Further, Appellant cannot claim any right to maintain suit as a mortgagee or judgment creditor. *See* 26 Pa.C.S. §103 (defining "condemnee" as "[t]he owner of a property interest taken, injured or destroyed. The term does not include a mortgagee, judgment creditor or other lienholder."). Relatedly, any assignment to Appellant of Lender's purported right to recover damages in the eminent domain proceedings, as part of the judgment in the mortgage foreclosure action, was ineffectual as a matter of law, by virtue of the fact that the Property had been purchased at a sheriff's sale. *See Warner's Estate,* 24 Pa. D. & C. 177, 182 (1935) ("[I]f a lienholder . . . is entitled to recover the damages paid by the condemnor to the owner he must act while the relationship of lienholder and owner still exists. If, without so acting, he forecloses his mortgage and takes title to the land, he loses all right to damages because the mortgage is extinguished" (citing *Irons*

11

*v. Pittsburgh*, 64 Pa. Super. 126, 130-31 (1916));[6] *cf. Mellon Bank, N.A. v. Crystian (In re Crystian)*, 197 B.R. 803, 805 (Bankr. W.D. Pa. 1996) (concluding that where "[t]he condemnation proceeds [were] the subject of a covenant and [were] assigned to the [b]ank," and "[i]n Pennsylvania, upon condemnation, a lien is divested from the land but attaches by operation of law to the [proceeds]," "the assignment of the proceeds in the mortgage covenant does not constitute additional security" to "the lien of the mortgage").  Therefore, for purposes of the Rules of Civil Procedure, Appellant, "by operation of law," cannot be deemed a "successor" to Plaza, Pa.R.C.P. No. 2351, and lacks standing to pursue this appeal.

Accordingly, we grant the City's motion to quash and dismiss the appeal because Appellant does not possess standing to pursue it.

Assuming, *arguendo*, that Appellant had standing to maintain this appeal, we would conclude that its assertions of error lack merit.  Appellant contends that the trial court erred in granting summary judgment in favor of the City because there are genuine issues of material fact regarding the role that the Mayor, the Director of Economic Development, and the Chairman of the ANIZDA Board had played with respect to Talen's relocation.[7]  Appellant argues that the evidence it

---

[6] In *Irons*, the Superior Court determined that while a mortgagee creditor has standing to intervene and claim condemnation damages to the extent necessary to satisfy the lien, "[w]hen the property was sold at judicial sale, the . . . mortgage was extinguished" and, therefore, "the land pledged for the debt was reduced to possession by the creditor."  64 Pa. Super. at 130.  Consequently, the former mortgagee "was no longer a lien creditor" and it could not recover damages in the commendation proceedings because it could only do so "at a time when the relation of owner and lien creditor exist[ed]."  *Id.* at 130-31.

[7] "Preliminary objections are the exclusive method under the Code of raising objections to a petition for the appointment of a board of viewers alleging a *de facto* taking."  *Genter v. Blair County Convention and Sports Facilities Authority*, 805 A.2d 51, 55 n.6 (Pa. Cmwlth. 2002).  Although the Code authorizes a court of common pleas to permit the parties to engage in discovery, **(Footnote continued on next page…)**

12

garnered from discovery is sufficient to establish that these individuals engaged in "a concerted effort . . . to develop a special mechanism to enable [PPL] to vacate the Property and relocate to a new, to-be-built property within the NIZ [Zone] and receive NIZ benefits." (Appellant's Br. at 41.)

We disagree. Viewing the record evidence in the light most favorable to Appellant, and resolving all conflicts in the evidence in its favor, the evidence is nonetheless insufficient to state a viable *de facto* taking claim as a matter of law. As presented, Appellant's claim does not fit within the basic rubric that is designed for a *de facto* taking under the Code, and it is simply outside the legal scope of the doctrine.

In Pennsylvania, the theory of eminent domain has constitutional underpinnings in the concept of just compensation for a governmental taking, and our General Assembly has enacted the Code to provide a substantive right and procedure to accomplish that end. *See Pittsburgh Railways Co. v. Port of Allegheny County Authority*, 202 A.2d 816, 821 (Pa. 1964). Section 502(c) of the Code vests a landowner with a right to assert what is commonly known as a *de facto* claim or taking. By its very nature, this type of claim involves specified property that has not been formally taken by a governmental entity through the actual exercise of the

**(continued…)**

26 Pa.C.S. §306(f)(2), unlike civil actions governed by the Rules of Civil Procedure, the taking of discovery does not convert the preliminary objections into a summary judgment motion. The end result is that the standard of review for summary judgment motions, particularly the law pertaining to the existence of a genuine issue of material fact, is inapplicable in this case. Unlike its role in resolving summary judgment motions, a court of common pleas, in ruling on preliminary objections in a case under the Code, is charged with resolving evidentiary conflicts. *In re Condemnation by Commonwealth, Department of Transportation*, 827 A.2d 544, 547 n.4 (Pa. Cmwlth. 2003). In any event, there has been no allegation that the trial court erred in utilizing the summary judgment procedure to dispose of this case.

power of eminent domain, and it "is applicable only where a condemnor is found by the court to have taken property without the filing of a declaration of taking." *Department of Transportation v. Schodde*, 512 A.2d 101, 102 n.1 (Pa. Cmwlth. 1986).

Generally, the factual and legal matrix for a *de facto* claim takes one of two forms. Where, as here, a governmental entity does not announce a plan or its intention to institute formal condemnation proceedings to take a specified portion of land or area, *see, e.g.*, *Lehigh-Northampton Airport Authority v. WBF Associates, LP*, 728 A.2d 981, 985-89 (Pa. Cmwlth. 1999) (discussing cases),[8] a landowner can assert a *de facto* claim by establishing that the consequential or collateral effects from a formal condemnation proceeding have resulted in a taking of his or her property. *See, e.g.*, *Wolf v. Department of Highways*, 220 A.2d 868, 871 (Pa. 1966).[9]

---

[8] In *Lehigh-Northampton Airport Authority*, this Court described the test for such a claim a follows:

> Where a property is designated for formal condemnation pursuant to a planned, prospective public improvement, adverse interim consequences caused to the property by the prospect of condemnation will not constitute a *de facto* taking unless those interim consequences are that the owner is deprived of the use and enjoyment of the property, or is subjected to the loss of the property before formal condemnation can provide compensation. If there has been such an interim deprivation of use, or exposure to loss, then the principle of *de facto* taking becomes applicable to accelerate the time when the governmental authority must make compensation.

728 A.2d at 988 (internal citation omitted). *See also Visco v. Department of Transportation*, 498 A.2d 984, 986-87 (Pa. Cmwlth. 1985) (discussing a case where "plans were recorded, with notices of intention to condemn being sent to some property owners" and "the property involved was in the line of taking").

[9] *Wolf* provides an example of this type of claim, namely where the Department of Transportation condemns land to build roads or related infrastructure and a nearby landowner **(Footnote continued on next page…)**

In this context, a landowner such as Appellant must demonstrate, at a minimum, three separate criteria. "[O]ne of the requisites of a *de facto* taking is that the condemnor must be an entity clothed with the power of eminent domain." *In re Condemnation by Commonwealth of Pennsylvania, Department of Environmental Resources*, 497 A.2d 284, 286 (Pa. Cmwlth. 1985). The second is that the "*de facto* taking must result from a governmental body's actual exercise of the power of eminent domain." *Darlington v. County of Chester*, 607 A.2d 315, 320 (Pa. Cmwlth. 1992). And the third is that "the damages sustained by the condemnee[—*i.e.*, the landowner—]must be an immediate, necessary[,] and unavoidable consequence of such exercise." *Riedel v. County of Allegheny*, 633 A.2d 1325, 1328 (Pa. Cmwlth. 1993). In other words, in its condensed formulation, "a *de facto* taking requires that the injury complained of [be] a direct result of intentional action by an entity incidental to its exercise of its eminent domain power." *In re Mountaintop Area Joint Sanitary Authority*, 166 A.3d 553, 562 (Pa. Cmwlth. 2017) (emphasis added).

Here, the operative facts supporting Appellant's claim that a *de facto* taking had occurred stem from the ANIZDA Board's conduct in issuing bonds to fund a hockey facility in the NIZ Zone. However, as mentioned above, the ANIZDA Board does not possess the statutory power to condemn. The ANIZDA Board is also an instrumentality of the Commonwealth. As such, it is a governmental entity that is

---

**(continued…)**

sustains injury to his/her property interests: "Where land is taken or purchased for highways, the abutting owner retains, as an incident to ownership of the remainder of his land, the right of access, or of ingress and egress. This right cannot be taken from him unless compensation is made therefor under the law." *Wolf*, 220 A.2d at 871 (internal citation omitted). However, in *Wolf*, the alleged harm to the landowner's right of ingress was "too remote" and "entirely unrelated" to the "property which was actually taken by the Commonwealth." *Id.* at 873.

15

separate and distinct from the City. Therefore, because the General Assembly has not granted the ANIZDA Board eminent domain authority, the activities of the ANIZDA Board cannot serve as a basis for a *de facto* claim. *See Rowland v. Department of General Services*, 820 A.2d 896, 899 (Pa. Cmwlth. 2003) ("[T]here is no dispute between the parties that neither the State Armory Board nor [the Department of Military and Veterans Affairs (DMVA)] is cloaked with the power of eminent domain . . . . Consequently, any allegation by [the landowner] in his brief that either the State Armory Board or DMVA effected a *de facto* taking of his property necessarily fails." (internal citations omitted)).

Moreover, Appellant's "*de facto* taking must result from [the] actual exercise of the power of eminent domain." *Darlington*, 607 A.2d at 320. Even if the Mayor or the Director of Economic Development were clothed with the power to condemn, which is highly questionable, that authority was not used in any manner. *A fortiori*, to the extent Appellant had suffered harm to the Property, it was not related to or incidental to an actual or formal condemnation by the Mayor or the Director of Economic Development. *Cf. In re Mountaintop Area Joint Sanitary Authority*, 166 A.3d at 562 (explaining that a landowner did not state a claim for a *de facto* taking where "the losses suffered by the [landowner] were merely the unintended consequence" of the governmental authority's condemnation activities and were "not . . . related to or incidental to [the authority's] condemnation powers"). Therefore, Appellant cannot assert that the activities of Mayor or the Director of Economic Development, in and of themselves, resulted in a *de facto* taking.

To overcome these hurdles, Appellant seemingly attempts to intermingle, both factually and legally, the conduct of the ANIZDA Board with the agents of the City, the Mayor and the Director of Economic Development.

Apparently, Appellant presupposes that the alleged condemnation power of the Mayor and the Director of Economic Development can be imported, imputed, or otherwise transferred to the ANIZDA Board. But only the General Assembly can grant a governmental entity the authority to condemn, and it has not done so with the ANIZDA Board. *See Pittsburgh Railways Co.*, 202 A.2d at 821 ("The legislature can grant the right to take private property for public use [and] may prescribe the kind and character of the security to be given and the manner in which it shall be given.").

In short, Appellant's claim is based on the implementation of legislation that is economic in nature and alleges that the above-mentioned individuals and/or entities conspired to place it at an economic disadvantage in the marketplace, which ultimately resulted in the loss of a tenant. At its core, the gist of the action underlying Appellant's claim sounds as a "business tort" or a form of unfair competition rather than a governmental taking. While Appellant argues that it has enough evidence to prove arbitrary and calculated action on the part of the ANIZDA Board, the Mayor, and the Director of Economic Development, and its theory may suffice for purposes of some other cause of action, it is simply not one that fits within—or is cognizable under—the Code.

Perceiving no reason to gild the lily, we conclude that the trial court did not err in granting summary judgment in favor of the City. Therefore, even if this Court did not dismiss Appellant's appeal for lack of standing, we would affirm the trial court's order on the merits.

Accordingly, for the reasons stated above, we grant the City's motion and dismiss the appeal.

_____
PATRICIA A. McCULLOUGH, Judge

17

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Somera Road – 835 West Hamilton   :
Street, LLC,   :
               Appellant   :
   :   No.  568 C.D. 2019
         v.   :
   :
City of Allentown   :

## *<u>ORDER</u>*

AND NOW, this 25th day of August, 2020, the motion to dismiss filed by the City of Allentown is granted and the appeal filed by Somera Road – 835 West Hamilton Street, LLC, from the April 12, 2019 order of the Court of Common Pleas of Lehigh County is hereby dismissed.

_____
PATRICIA A. McCULLOUGH, Judge